## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 3:18-cv-787-KAD |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ZVI KAUFMAN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### DEFENDANT'S CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant Zvi Kaufman files this Consolidated Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment [DE 64] and In Support of Defendant's Cross Motion for Partial Summary Judgment in his favor. For the purposes of Summary Judgment, Defendant Zvi Kaufman does not contest the Government's prima facia case that he failed to timely file required FBAR forms for Tax Years 2008, 2009, and 2010 by the date they were due. Instead, Defendant argues that summary judgment is inappropriate because his failure to do so was for "reasonable cause" and therefore the penalties are not proper under the law. Reasonable cause exists if Kaufman acted with "ordinary business care." This is a jury question.

Additionally, Defendant argues that partial summary judgment is appropriate in his favor to the extent that the Government seeks penalties greater than those allowed by law. Although the Government demands judgment "in the amount of $186,679.40, plus interest and statutory additions from and after December 6, 2019," the law permits penalties of only $30,000—$10,000 per untimely filed FBAR form. Accordingly, the Court should grant partial summary judgment in Defendant Kaufman's favor on this issue.

ORAL ARGUMENT REQUESTED

## INTRODUCTION

For the most part, the Government's Motion [DE 64] and supporting memorandum [DE 64–2] do a fine job recounting the legal background and facts of this case. Defendant Kaufman has lived in Israel since 1979 and of course has had bank accounts in that country for his ordinary investments, retirement, and personal banking. Because he is also a United States Citizen, however, US law required him to file FBAR forms in 2008, 2009, and 2010 that disclosed these Israeli bank accounts to the United States Financial Crimes Enforcement Network ("FinCEN"). Kaufman was not aware of this legal requirement, however. Accordingly, he did not timely file these FBAR Forms. When he learned of the requirement, he filed them then. There is no dispute that Kaufman's failure to timely file was anything other than an accident. The Government's complaint acknowledges that it was not willful.

Defendant Kaufman's opposition and cross-motion center around two important issues. *First*, Kaufman's failure to timely file his required FBAR forms was due to "reasonable cause." That is, Kaufman failed to timely file these forms even though he acted with ordinary business care under the circumstances. Notably, at all relevant times, Kaufman hired a competent United States accountant to prepare his United States tax returns and advise Kaufman on his IRS filing obligations. Kaufman gave that accountant all the information that he needed. Further, around the due dates of certain of the FBAR forms, Kaufman suffered two catastrophic health events (a heart attack in February 2010 and a car accident in which he was struck by a car as a pedestrian in January 2011) that reasonably interfered with his ability to comply. Whether Kaufman acted with ordinary business care under these circumstances—and thus with "reasonable cause"—is a

question for the jury that precludes summary judgment in the Government's favor. It is completely unaddressed in the Government's summary judgment motion.

_Second_, the Government's statement that "the amount of the [non-willful FBAR] penalty is capped at $10,000 per account per year" [DE 64-2 at 1] is incorrect. The law is presently not settled as to whether this $10,000 limitation is per *account* or per *FBAR Form*. The per-form limitation is the better reading of the law. Accordingly, Kaufman is subject to a non-willful FBAR penalty of no more than $30,000—$10,000 for each annual FBAR form that he did not timely file. The Government's request for judgment in excess of $186,679.40 is accordingly improper. Defendant is entitled to partial summary judgment to the extent that the Government seeks penalties greater than $30,000.

This Response and Cross-Motion will proceed in three parts. It will briefly articulate the applicable standard for Summary Judgment under Federal Rule of Civil Procedure 56. Then it will address the two above-referenced issues.

## SUMMARY JUDGMENT STANDARD

Judge Kari Dooley has recently and correctly articulated the standard applicable to Motions for Summary Judgment in *Bland v. Franceshi*, Case No. 3:16-cv-1406, 2019 WL 356828, at *1– 2 (D. Conn. Jan. 29, 2019):

> The standard under which the Court reviews motions for summary judgment is well-established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's inquiry focuses on "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the movant meets his burden, the nonmoving party must set forth "'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "[T]he party opposing summary judgment may not merely rest on the

allegations or denials of his pleading" to establish the existence of a disputed fact. *Wright*, 554 F.3d at 266; *accord Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). However, until the moving party comes forward with evidence that would establish his entitlement to judgment as a matter of law, the non-moving party is under no obligation to produce any evidence. *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001).

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50. Indeed, summary judgment is evaluated in the same fashion as a motion for a directed verdict. *Id.* at 250. The Supreme Court has "noted that the 'genuine issue' summary judgment standard is 'very close' to the 'reasonable jury' directed verdict standard: The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted." *Id.* at 251. "In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 252–53.

However, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. "[C]ourts may not make credibility determinations or weigh the evidence when confronted with a motion for summary judgment. All evidence presented by the nonmoving party must be taken as true, and all inferences must be construed in a light most favorable to the nonmoving party." *Catanzaro v. Weiden*, 140 F.3d 91, 93–94 (2d Cir. 1998), on reh'g, 188 F.3d 56 (2d Cir. 1999) (citing United States v. Diebold, 369 U.S. 654, 655 (1962) ). In sum, "where the facts specifically averred by [the nonmovant] contradict facts specifically averred by the movant, the motion must be denied." Lujan, 497 U.S. at 888.

There is no need to deviate from this formulation of the well-established summary judgment standard in the present case.

## ANALYSIS

**I.     Because Kaufman acted with "reasonable cause," the Government's Summary Judgment Motion must be denied. This is properly a question for the jury.**

This Court must deny the Government's Motion for Summary Judgment because a jury question remains as to whether Kaufman's failure to timely file his FBAR forms was due to

"reasonable cause." Whether an individual behaves as a reasonably prudent person under the circumstances is a question of fact for the jury, and accordingly is not appropriate for summary judgment. This section will first describe the applicable "reasonable cause" standard. Then, it will discuss the myriad facts from which a jury could conclude that reasonable cause exists in this case.

### A.   The "Reasonable Cause" Standard and the Jury's Crucial Role

First, discussion of the applicable "reasonable cause" standard is appropriate. Section 5321 of Title 31 of the US Code sets forth the authorization for the FBAR penalty. However, at 31 U.S.C. § 5321(B)(ii)(I), the Code states, "No penalty shall be imposed . . . with respect to any violation if such violation was due to reasonable cause."[1] "Reasonable cause" in this context is an affirmative defense upon which Defendant Kaufman bears the burden of proof by a preponderance of the evidence. *See United States v. Garrity*, Case No. 3:15-cv-243(MPS), 2018 WL 8263922, at *2 (D. Conn. May 1, 2018) (citing *Nance v. United States*, Case No., 2013 WL 1500987, at *5–6 (W.D. Tenn. Apr. 11, 2013)).

"[T]he term 'reasonable cause' is not defined in the Code." *United States v. Boyle*, 469 U.S. 241, 246 (1985). But its meaning "has become clear" over the nearly 100 years of its presence in the statutes. *Id.* at 245. A person has acted with reasonable cause if he "exercised ordinary business care and prudence," but nevertheless failed to fulfil his filing obligations. *Id.* at 246. Importantly, "ordinary care" is not the same thing as "perfect care." *See Dillworth v. Gambardella*, 970 F.2d 1113 (2d Cir. 1992) (discussing the "ordinary care" standard in the negligence context

---

[1] Section 5321(b)(ii)(II) additionally requires that "the balance in the account at the time of the transaction was properly reported." This provision requires that, before a reasonable cause defense can be asserted, a Taxpayer must have properly reported the relevant account balances on a subsequently filed delinquent FBAR form. *See* Internal Revenue Manual 4.26.16.6.4(2)(b) (available at http://irs.gov/irm). There is no dispute that Kaufman has properly filed accurate but delinquent FBAR forms in fulfilment of this obligation, and therefore this requirement is not at issue. [*See* DE 64-5 through 64-7, in which the Government attaches copies of Kaufman's late-filed FBAR forms to support its summary judgment motion; DE 64-1, in which the Government uses these delinquent FBARs to establish the existence of Kaufman's Israeli accounts.]

and observing that skiers may lose control "even while exercising due care."); *see also Gresser v. Union Pacific R. Co.*, 130 F. Supp. 2d 1009, 1015 (C.D. Cal. 2001) (observing that a railroad's duty to exercise ordinary care required it to "keep [a] crosswalk reasonably safe for persons exercising ordinary care, not to keep it in perfect condition."). Instead, the standard requires only the care that an ordinary person would consider reasonable and prudent under the circumstances. *See* Black's Law Dictionary, "Ordinary Care" (11th ed. 2019) (cross-referencing to "care – reasonable care").

The IRS itself acknowledges that a person may act with "ordinary care" but still fail to file an FBAR form. In elaborating upon the "reasonable cause" standard, the Internal Revenue Manual observes that an individual may delegate certain tax obligations in appropriate circumstances. The Manual notes, "Ordinary business care and prudence includes *making provisions for business obligations to be met* when reasonably foreseeable events occur." Internal Revenue Manual 20.1.1.3.2.2(1) (available at http://irs.gov/irm). Further, reasonable cause may exist if a taxpayer does not know what the law requires of him and hires others to tell him. *See* Internal Revenue Manual 20.1.1.3.2.2.6 (observing that "[i]n some instances taxpayers may not be aware of specific obligations to file and/or pay taxes"). In such circumstances, the law requires only that "taxpayers make reasonable efforts to determine their tax obligations." *Id.*

Importantly, it has long been established that whether a person has exercised ordinary care and behaved reasonably under the circumstances is almost always a question of fact for a jury. This is seen in some of the courts' earliest cases on ordinary care in the negligence context. *See Mosheuvel v. District of Columbia*, 191 U.S. 247, 262–63 (1903) ("[I]t is a question of fact for the jury whether, in passing over a walk known to be dangerous, instead of taking some other route, the plaintiff is or is not in the exercise of ordinary care."). *Accord, Lehigh Valley R. Co. v. Kilmer*,

231 F. 628, 635 (2d Cir. 1916) ("The question whether, having stopped and looked and listened 145 feet from the crossing without seeing or hearing anything, ordinary care and prudence required him to stop again before going upon the tracks, and whether he could have been in the exercise of due care in looking and listening, when he neither saw nor heard this train until he got upon the track, were under all the circumstances questions of fact for the jury."); *Erie R. Co. v. Downs*, 250 F. 415, 418 (2d Cir. 1918) ("The evidence shows that defendant's employees, in their work in the yard where the accident occurred, constantly crossed the tracks, and that that practice was perfectly well known to all persons engaged in operating trains; and it was left to the jury to say whether defendant was conducting its business with ordinary care and prudence, if, with knowledge of this practice, it sent the car or set of cars down from the hump the night in question without any lanterns or lights, and allowed them to come into collision with the stationary car that was standing on the track, pushing it a considerable distance, and causing the injury complained of herein."); *Doyle v. Exxon Corp.*, 592 F. 2d 44, 47 (2d Cir. 1979) ("While it is true the plaintiff was unable to prove a precise date on or before which Exxon was to execute its promise, what constituted a reasonable time for performance became a question of fact properly left to the jury to determine under the particular circumstances of this case").

And, much more recently, the Second Circuit has confirmed that a jury should evaluate whether conduct constitutes ordinary care. In *Williams v. Utica College of Syracuse University*, 453 F.3d 112, 118–19 (2d Cir. 2006), the Second Circuit extensively discussed the matter. In holding that a "District Court erred in finding that, on the facts of [a] case, the issue of breach of duty could be decided in Appellee's favor at summary judgment," the Court discussed "the age-old debate as to when it is appropriate for a court to decide the question of a defendant's due care as a matter of law, rather than allowing a jury to resolve it as an issue of fact." *Id.* at 118–19 (citing

*Stagl v. Delta Airlines, Inc.*, 52 F.3d (2d Cir. 1995)). The Court observed that "Justice Holmes' view—that standards of conduct ought increasingly to be fixed by the court for the sake of certainty—**has been largely rejected**." *Id.*(emphasis added). Instead, the Court held, "it is particularly appropriate to leave [a finding of breach of duty] to the jury" because there is "room for a difference in view as to whether [the defendant's] conduct in the particular circumstances of this case did or did not evidence a lack of due care" and "perhaps above all, because **in the determination of issues revolving about the reasonableness of conduct, the values inherent in the jury system are rightfully believed an important instrument in the adjudicative process.**" *Id.* (emphasis added). In other words, what qualifies as ordinary care should be determined by ordinary folks—that is, a properly constituted jury of the Defendant's peers.

> B.    *Ample evidence could support a reasonable Jury's conclusion that Kaufman acted with "reasonable cause."*

The caselaw discussed above suggests that whether a defendant has breached a duty of ordinary care is almost always a jury question. But this is especially so in Kaufman's case. Ample evidence could support a reasonable jury's conclusion that Kaufman acted with "ordinary business care" and thus "reasonable cause." A narrative of these facts is included below.

> 1.    Kaufman lives and works in Israel, and hired a CPA to advise him of his IRS filing obligations.

Defendant Kaufman has lived in Israel—not the United States—since 1979, more than thirty years before his conduct at issue in this case. [Kaufman Aff. at ¶2.][2]  He spent his working life in Israel, and had a successful career as an executive with a pharmaceutical company there. He remained a United States citizen, however. Although he lived (and, still lives) in Israel, he has never neglected his US tax filing obligations. [Kaufman Aff. at ¶5.]

---

[2]    An affidavit by Defendant Zvi Kaufman is attached as an Exhibit to this filing.

Rather, all the way back in 1979, Kaufman hired a competent New York-based CPA named Larry Foss to handle the filing of his tax returns and any other IRS-enforced reporting requirements. [*Id.* at ¶6.] CPA Larry Foss was not only a competent accountant—he was also Kaufman's relative through marriage. [*Id.* at ¶9.] As part of Kaufman's family, CPA Foss was entirely aware that Kaufman lived and worked in Israel and that Kaufman maintained numerous financial accounts in Israel in connection with these activities. [*Id.*] Each year, CPA Foss timely prepared Kaufman's United States income tax returns. [*Id.*. at ¶11.] However, because Kaufman already paid Israel's relatively higher taxes, and the US Internal Revenue Code allows for a credit for foreign taxes paid, Kaufman rarely had any significant tax liability. [*Id.*. at ¶13.] Indeed, Kaufman had no significant US tax liability for 2008, 2009, and 2010—the years at issue in this case.[3] [*Id.*]

One thing CPA Foss never did, however, was prepare and file an FBAR Form on Kaufman's behalf, or tell Kaufman that he was required to do so.  By 1979, the FBAR filing requirement had been on the books for 9 years. But despite knowing that Kaufman had Israeli accounts, CPA Foss never informed Kaufman of his FBAR filing obligations and never prepared or filed an FBAR form on Kaufman's behalf. [Kaufman Aff't ¶¶4, 14, 18.] And in light of the Government's anemic efforts to publicize the new requirement, Foss's failure is not surprising.

        2.        <u>The Government's efforts to publicize the FBAR requirement from 1970 through 2009 were lacking.</u>

Although Congress enacted the FBAR filing requirement as part of the Bank Secrecy Act of 1970, the Government did little to publicize the new requirement. Indeed, the Government

---

[3]      Specifically, Kaufman had total US tax liabilities of $2,883 for Tax Year 2008, $1,149 for Tax Year 2009, and $356 for Tax Year 2010. His liability for earlier years was even less, or nonexistent. [Kaufman Aff't at ¶13.]

appears not to have even regularly kept its own records concerning FBAR compliance until 2002.

That year, Congress required the Treasury Secretary file an annual report on FBAR compliance,

given the perceived benefit that such reporting could have in the Government's efforts against

international terrorism.   *See* USA-PATRIOT Act, Pub. L. No. 107-56 § 361(b) (2001). This

requirement specifically instructed that the Treasury Secretary's "initial report shall include

historical data on compliance with such reporting requirements." *Id.*

But the data was thin. The Secretary observed[4] only that "FBAR filings since 1991 have

increased 51.9%." Specifically, "[i]n calendar year 1991, the [IRS Detroit Computing Center]

received 116,600 FBARs" but "[i]n calendar year 2001, the number of FBAR forms posted to the

database was 177,151." The Treasury Secretary acknowledged that "[i]t is difficult to determine

with any accuracy how many taxpayers are failing to file required FBARs in any calendar year"

but stated that its best estimate based upon limited information was that the compliance rate "could

be less than 20 percent" as of the 2002 report.

Back in 1979, when Kaufman left the United States for Israel, the FBAR compliance rate

would be even lower. The Treasury Secretary's 2002 Report acknowledges only four methods that

the Government had used to publicize the FBAR filing requirement by that time. It notes that the

IRS includes the FBAR among its "forms and publications" online. It also notes that FinCEN's

website[5] "posts a 'Reminder of Requirement to File a Report of Foreign Bank and Financial

Accounts, Form TD F 90-22.1 (FBAR)' to highlight the need to file the form." It observes that the

requirement is listed in IRS Publication 54–Tax Guide for U.S. Citizens and Resident Aliens

---

[4]        These quotations are pulled from "A Report to Congress in Accordance with § 361(b) of the USA PATRIOT Act," submitted to Congress by the Secretary of the Treasury on April 27, 2002. It is available on the Treasury Department's website at https://www.treasury.gov/press-center/press-releases/Documents/fbar.pdf

[5]        The Report contains no information indicating that any reasonable taxpayer would ever have occasion to visit FinCEN's website. The very idea is absurd. That this was included as an example of the Treasury Department's publicity efforts speaks volumes.

Abroad. And it notes that "[t]he primary notification to a person that it may need to file an FBAR form . . . is guidance provided in the IRS Form 1040" itself. Specifically, Taxpayers that file a form Schedule B are instructed to file an FBAR reporting their foreign accounts.

But none of these existed in 1979. Neither the IRS nor FinCEN had a website at that time. In fact, FinCEN itself would not be created for another eleven years. The IRS did not introduce Publication 54 until 1995. And Schedule B of Form 1040 was not amended to reference the FBAR requirement (in a one-line parenthetical at line 7) until 1984.[6] By this time, Defendant Kaufman was firmly ensconced in his life in Israel. He was reasonably focused on his family and professional life there. He (again, reasonably) was not *personally* attuned to developments in US financial reporting law.

### 3.    Kaufman's reasonable reliance on his US CPAs

But that is not to say that Kaufman neglected his obligations. Rather, from at least 1979 on, Defendant Kaufman has retained and reasonably relied upon competent accountants to prepare his income tax returns and keep abreast of any other filings Kaufman may need to make with the IRS. [Kaufman Aff't ¶¶6 & 17.] This is precisely the sort of "ordinary business care" that reasonable cause requires. To Kaufman, everything seemed to be properly taken care of. Until this case, Mr. Kaufman has had **no issues** with the IRS. His returns and other filings were always properly prepared, filed, and accepted. [*Id.* at ¶11.] Nothing happened that would indicate that Defendant Kaufman needed to do anything other than what he had been doing for the past 30+ years. [*Id.* at ¶¶4, 11, 14, 18.]

It should be noted that in November of 2005, CPA Foss passed away. [*Id.* at ¶¶11 & 16.] But his accounting firm remained a going concern. [[*Id.* at ¶15–16.] It was purchased by another

---

6    These facts are matters of public record that Defendant will ask the Government to stipulate to—or for the Court to judicially notice—at trial.

well-regarded CPA firm named Manzi, Pino & Company, P.C. ("Manzi Pino"). [*Id.* at ¶16.] Importantly, continuity was preserved. Manzi Pino acquired not only CPA Foss's client relationships and data, but also its employees. [*Id.* at ¶16.] These employees had been handling Kaufman's account and preparing Kaufman's returns along with CPA Foss for years before CPA Foss died. [*Id.* at ¶16.] These employees were likewise familiar with Kaufman, knew that Kaufman lived and worked exclusively in Israel, and knew that Kaufman had Israeli financial accounts. [*Id.* at ¶16.] Still, even after Manzi Pino acquired CPA Foss's firm, they never advised Kaufman that he was required to file an FBAR form.

Another observation should be made at this point. In the scheme of things, Kaufman's US tax filing obligations were of relatively low priority both to Kaufman and to his CPAs. [[*Id.* at ¶13.] And this was completely reasonable. As set forth above, Kaufman's US tax burden was *de minimus* because his earnings were already subject to the higher Israeli income tax. Accordingly, he rarely owed any US tax and when he did the amounts were minimal. [*Id.*]  Due to this circumstance, both Kaufman and (likely) his CPAs subjected Kaufman's account to lower level of scrutiny than they would have if substantial dollars were involved. Again, this was reasonable. These sorts of decisions—how to allocate limited available attention—are entirely consistent with reasonable behavior and ordinary business care. Perfection in all things is not reasonable. Indeed, it is not even possible.

There are some bad facts for Kaufman, however. By the undersigned's count there are two. First, on September 15, 2010—after the due date for his 2009 FBAR but before the due date for his 2010 FBAR—Chris Devine (a CPA who worked first for CPA Foss and then for Manzi Pino), asked Kaufman in an email whether Kaufman had any "foreign accounts" and Kaufman replied that he did not. [Kaufman Aff't at ¶19.] Notably, however, Kaufman had regularly

disclosed to Manzi Pino and CPA Foss that he had Israeli financial accounts during the preceding **thirty years** of their professional relationship. Accordingly, when CPA Devine asked Kaufman this question, Kaufman interpreted the question as asking whether Kaufman had any accounts foreign **to him**—that is, outside of the United States and Israel. [*Id.* at ¶19.]

The reasonableness of this interpretation has been observed by no lesser an authority than Charles P. Rettig, the current IRS Commissioner, in publications he made while in private practice. In an article entitled "Why the Ongoing Problem with FBAR Compliance?" published in the August–September 2016 edition of the Journal of Tax Practice & Procedure,[7] now-Commissioner Rettig observed as follows:

> The United States is among very few countries that tax their citizens' worldwide income, even when those citizens choose to indefinitely live abroad. Even though they have no resulting tax obligations, under FATCA, nonresident Americans are generally required to file tax returns and reports regarding their "foreign" financial accounts and assets, subject to the threats of significant penalties and criminal sanctions. **In addition, for most, their "foreign" accounts and assets are typically located in their country of residence. Such accounts are only "foreign" when viewed from a U.S. perspective.**

*Id.* at 38 (emphasis added).

In Kaufman's case, specifically, his interactions with his CPAs bolstered the reasonableness of this interpretation. Since 1982, Schedule B of a Form 1040 U.S. Income Tax return includes a question asking whether the reporting taxpayer has any financial accounts in any "foreign country," without further elaboration. [Kaufman Aff't at ¶20.]  Each year since 1982, CPA Floss (and later Manzi Pino) delivered to Kaufman a prepared Form 1040 with the answer to this question checked "no." [*Id.*] They did so despite the fact that Kaufman was completely forthright with his CPAs that he lived and worked in Israel and maintained financial accounts

---

7        For the court's ease of reference, this publication is also attached.

there. Indeed, each of Kaufman's returns since 1979 clearly list Kaufman's Israeli address as the very first information at the top of the form. [*Id.* at ¶¶12, 20–21.] Further, the returns are replete with information on Kaufman's Israeli employment, earnings, and Israeli taxes paid. For example, the word "Israel" appears on Kaufman's 2008 Tax Return no fewer than 7 times, notably in Kaufman's address and his employer's address, and detailing tax payments made in Israeli shekels. [*Id.* at ¶¶12, 20–21.] Every year that Kaufman received a Form 1040 Schedule B from his CPAs indicating that he had no foreign accounts, his belief that the term referred to accounts outside of Israel became more firm and—crucially—more reasonable. [*Id.* at ¶¶12, 20–21.]

Second, on June 12, 2009, CPA Devine sent Kaufman an email stating that he wanted to remind Kaufman "that US Department of Treasury Form TD 90-22.1, Report of Foreign Bank Account and Financial Accounts, is due 6/30/09 **if you are required to file.**" [*Id.* at ¶22 (emphasis added).] Manzi Pino included a similar notice with Kaufman's 2008 Tax Return. [*Id.*] But Kaufman had never heard of a Form TD 90-22.1 before. [*Id.*] Further, he had hired and paid CPA Floss and Manzi Pino to inform him of and prepare any filings that needed to be made with the IRS. He therefore reasonably believed that if he had to file such a form, his CPAs would have prepared the form and would have told him that he had to file it. [*Id.* at ¶¶6, 16, 17, 22.] He therefore reasonably believed that these notices were a sort of boilerplate that did not apply to him. [*Id.* at ¶22.]

Kaufman continued to behave reasonably through June 30, 2011, the due date for his 2010 FBAR. Manzi Pino finally correctly informed Kaufman that he was required to file FBAR forms around September 2011. [Kaufman Aff't ¶23.] This was before the due date for Kaufman's 2010 Form 1040 Tax Return, but after the due date for Kaufman's 2010 FBAR. [*Id.*]

At this time, Kaufman reasonably lost faith in Manzi Pino. Manzi Pino had failed to inform him of his FBAR filing obligations for years.[8] [Kaufman Aff't ¶23.] And Kaufman did not trust them to get it right overnight. But, again, Kaufman did not simply ignore the problem. Instead, he again acted reasonably. He hired *another* CPA—one who lived in Israel and specialized in US tax law. That CPA then referred Kaufman to an Israeli attorney who specialized in FBAR matters. [*Id.* at ¶24.] Together, they prepared and filed Kaufman's delinquent FBAR forms and amended tax returns. [*Id.* at ¶24.]

### 4. Kaufman's Poor Health at the Relevant Times

Finally, because ordinary business care is evaluated in light of the totality of the circumstances, a word needs to be said about Kaufman's health during the years at issue. At the times relevant to this case, Kaufman was not well. [Kaufman Aff't at ¶25.] On February 11, 2010 (about four months before the June 30, 2010 due date of his 2009 FBAR) Kaufman suffered a serious heart attack. He was immediately hospitalized for eight days and subject to intermittent hospitalization in the months that followed. [*Id.* at ¶24.] Additionally, on January 13, 2011, Kaufman was struck by a car while he was on a walk. [*Id.* at ¶27.] He suffered head trauma and was taken to the hospital by ambulance. [*Id.*] As a result of both incidents, Kaufman had trouble concentrating and cognitive impairment. [*Id.* at ¶28.] Following the January 2011 motor vehicle

---

[8]    Kaufman does not know why Manzi Pino erred in this regard. It is beyond the scope of this case in any event. But Manzi Pino's mistake is not unusual. As late as 2015, 7.2 million of the estimated 8.7 million Americans living abroad did not file an FBAR. *See* Charles P. Rettig, "Why the Ongoing Problem with FBAR Compliance?" J. Tax Prac. & Proc. (Aug–Sep. 2016). And, by then, the FBAR compliance rate had increased by a whopping 17 percent per year, every year since 2010. *Id.* In reality, the FBAR filing requirement was under-publicized for a long time, including among professional circles. It became a hot topic in professional circles, however, in late 2009. At this point, the United States Department of Justice finally cracked Swiss Bank Secrecy by entering a non-prosecution agreement with UBS that required it to disclose names of Americans using foreign UBS accounts to hide assets from the IRS. This information was subsequently used to seek massive penalties for these American's willful failure to disclose their accounts on an FBAR form. Of course, Kaufman has nothing to do with UBS. And the Government does not contend that the Kaufman's failure to disclose was willful. But it is very possible that Manzi Pino was simply not aware of the FBAR requirements themselves until the publicity resulting from the Government's UBS action.

accident, specifically, Kaufman consulted with a neuropsychologist and psychiatrist. They determined that Kaufman suffered deficiencies in cognition, attention, and memory, and could not remember tasks he had to complete and instructions that he had read. [*Id.*] Accordingly, they recommended that Kaufman could no longer work. [*Id.*] These circumstances make Kaufman's reliance on Manzi Pino to properly inform him of his filing obligations during the years at issue all the more reasonable.

In light of the foregoing, the Government's summary judgment motion must be denied. A reasonable jury could conclude, based upon the evidence forecasted above, that Kaufman acted with ordinary business care in light of the totality of his circumstances, but that he nevertheless failed to file his FBAR forms. In such a situation, Kaufman acted with reasonable cause and the law does not permit the penalty that the Government seeks. Whether Kaufman behaved reasonably remains a question of fact for a jury to decide. *See Williams v. Utica College of Syracuse University*, 453 F.3d 112, 118–19 (2d Cir. 2006).

**II.      Partial Summary Judgment in Defendant's favor is appropriate to the extent that the Government seeks a penalty greater than $30,000—$10,000 for each FBAR form not timely filed.**

Although summary judgment is not appropriate as to Defendant Kaufman's liability in this case, summary judgment is appropriate against the Government to the extent that it seeks a non-willful FBAR penalty greater than $30,000—$10,000 for each of the Defendant Kaufman's delinquent FBAR forms. Defendant Kaufman has committed three non-willful FBAR violations by filing accurate 2008, 2009, and 2010 FBAR penalties after their respective due dates. In doing so, he failed to timely disclose twelve accounts for 2008, twelve accounts for 2009, and seventeen accounts for 2010.

Section 5321(a)(5)(A) of Title 31 of the U.S. Code authorizes the non-willful FBAR penalty at issue. It states that the Treasury Secretary may impose a penalty "on any person who violates, or causes any violation of, any provision of section 5314 [which contains the FBAR reporting requirement]." Section 5321(a)(5)(B)(i) cabins that discretion. It further states that (unless a violation is willful) "the amount of any civil penalty imposed under subparagraph (A) shall not exceed $10,000." An important question therefore emerges: is the "violation" punishable by up to $10,000 the failure to timely file the FBAR form? Or is the "violation" the failure to disclose each particular account during any given year?

If the violation is per form, Kaufman is subject to maximum penalty of $30,000 in this case—$10,000 for each late-filed form (one in Tax Year 2008, one in Tax Year 2009, and one in Tax Year 2010). If the violation is per account, Kaufman is subject to a maximum penalty of $410,000 for the conduct in this case ($120,000 for his twelve undisclosed accounts in Tax Year 2008, $120,000 for his twelve undisclosed accounts in Tax Year 2009, and $170,000 for his seventeen undisclosed foreign accounts in Tax Year 2010).

The Government takes the position that the statute authorizes a penalty of $10,000 per untimely disclosed account, per year. Perhaps recognizing the patent absurdity of a life-ruining $410,000 penalty in this case, however, the Government has exercised its unilateral discretion to impose a lesser penalty of "only" $144,244. But even this penalty is not permitted. The correct reading of Section 5321(a)(5)(b)(i) is that it permits a penalty of only $10,000 per "violation," and that Kaufman's single "violation" each year was his failure to timely file the FBAR form when due.

This presents a matter of first impression for this Court. Indeed, only one other district court in the country appears to have addressed the issue. In *United States v. Boyd*, Case No. 18-

cv-803 (C.D. Cal. Apr. 23, 2019), the Central District of California held for the Government. That case—and specifically this issue—is presently subject of appeal before the Ninth Circuit in *Boyd v. United States*, Case No. 19-55585 (9th Cir. 2019).[9] For the reasons that follow, this Court (and, for that matter the Ninth Circuit) should determine that that Section 5321(b)(5)(b)(i) limits a non-willful FBAR penalty to $10,000 per "violation," which term in turn refers to the failure to timely file an FBAR form for any given year. Under such a reading, summary judgment would be appropriate in Kaufman's favor to the extent that the Government's claim exceeds $30,000.

A.    *An analysis of the relevant statutes*

Since this question presents an issue of statutory interpretation, the Court should of course start with the text of the relevant statutes. They are reproduced below. First, Section 5321(a)(5) provides for the penalty at issue and limits its amount. It states as follows

(A) Penalty authorized.— The Secretary of the Treasury may impose a civil money penalty on any person who violates, or causes any violation of, section 5314 [the FBAR requirement].

(B) Amount of penalty—

(i) In general.—Except as provided in subparagraph (C) [for willful violations], the amount of any civil penalty imposed under subparagraph (A) shall not exceed $10,000.

31 U.S.C. § 5321(a)(5). Section 5314, however, does not directly describe a requirement that a taxpayer may violate. Instead, it describes certain requirements the Treasury Secretary shall impose. As relevant to this case, Section 5314 directs the Secretary to require taxpayers to "keep records, file reports, or keep records and file reports." Section 5314 states as follows:

(a) Considering the need to avoid impeding or controlling the export of monetary instruments and the need to avoid burdening unreasonably a person making a transaction with a foreign financial agency, the Secretary of the

---

[9]    Indeed, the matter has been the subject of extensive briefing in that case. The amicus brief of the American College of Tax Counsel, prepared by former Acting Assistant Attorney General in charge of the DOJ's Tax Division, Caroline Ciraolo, is particularly helpful.

> Treasury **shall require a resident or citizen** of the United States or a person
> in, and doing business in, the United States, **to keep records, file reports, or
> keep records and file reports**, when the resident, citizen, or person makes a
> transaction or maintains a relation for any person with a foreign financial
> agency. The records and reports shall contain the following information in
> the way and to the extent the Secretary prescribes: (1) the identify and address
> of participants in the transaction or relationship. (2) the legal capacity in
> which the person is acting. (3) the identity of the real parties in interest. (4) a
> description of the transaction.

31 U.S.C. § 5314(a). In response, the Treasury Secretary promulgated 31 C.F.R. § 1010.350, which

requires persons with foreign accounts to report their relationships to the accounts "on a reporting

form," specifically, "the Report of Foreign Bank and Financial Accounts (TD-F 90-22.1) [the

FBAR]."

    A plain reading of these statutes demonstrates that Congress authorized up to a $10,000

penalty for a non-willful "violation" of 31 U.S.C. § 5314. And Section 5314 itself requires the

filing of reports. Accordingly, the plain language of these statutes shows that the $10,000 penalty

limitation applies per report rather than per account.

      B.    *Applicable cannons of statutory construction support Kaufman's reading*

    Important cannons of statutory construction also lead to this conclusion. First, it is well

settled that "Congress generally acts intentionally when it uses particular language in one section

of a statute but omits it in another." *Republic of Sudan v. Harrison*, 139 S.Ct. 10408, 1058 (2019).

Later on within Section 5321 itself, Congress demonstrated that it knows how to base penalties on

undisclosed accounts rather than unfiled forms.  Section 5321(a)(5)(D)(ii) discusses the penalty

for *willful* failure to file an FBAR. That section pegs the applicable penalty to the following: "in

the case of a violation involving a failure to report the existence of an account or any identifying

information required to be provided with respect to an account, the balance in the account at the

time of the violation." By contrast, the non-willful penalty at Section 5321(a)(5)(B)(i) omits any

reference to accounts at all. Well settled cannons of statutory construction require the inference

that, accordingly, the non-willful FBAR penalty amount does not turn on the number of accounts a taxpayer may have.

Second, "[a] statute should be interpreted in a way that avoids absurd results." *SEC v. Rosenthal*, 650 F.3d 156, 162 (2d Cir. 2011). And the Government's proposed interpretation is indeed absurd. The non-willful FBAR penalty punishes only accidental failure to file an FBAR form. In such a situation, the number of accounts that an individual holds does not correlate with the blameworthiness of his conduct. By definition, he was not trying to conceal *any* of his accounts. Rather, his fault lies in overlooking the FBAR requirement completely. It is accordingly absurd to interpret Section 5321(a)(5)(B)(i) to peg the non-willful FBAR penalty to the number of accounts a person just so happens to have. This contrasts nicely with the *willful* FBAR penalty at Section 5321(a)(5)(D)(i). Where a taxpayer conceals his accounts on purpose, the blameworthiness of his conduct does indeed correlate to how many accounts he is hiding, rather than how many forms the Government requires.

Finally, the rule of lenity applies in the face of an ambiguous penalty statute. If the Court determines that Section 5321(a)(5)(B)(i) is anything but clear, the rule of lenity requires that the Court construe it against the Government and in favor of Defendant Kaufman. "[T]he rule of lenity . . . applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010). The rule is most often applied in the criminal context, but also applies "when the civil sanctions in question are punitive in character." *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1398 (9th Cir. 1995); *see also Johnson v. United States*, 135 S.Ct. 2551, 2577 n.1 (2015) (Thomas, J., concurring) ("[A] law imposing a monetary exaction as punishment for noncompliance with a regulatory mandate is penal."). Even in the tax

context, "tax provision[s] which impose[] a penalty [are] to be construed strictly; a penalty cannot be assessed unless the words of the provision plainly impose it." *Bradley v. United States*, 817 F.2d 1400, 1402–03 (9th Cir. 1987).

C.     *The Treasury Departments' own publications have, at times, supported Kaufman's view.*

In its more clear-headed moments, the Treasury Department itself has recognized the wisdom of treating Section 5321(a)(5)(B)(i) to permit only a single $10,000 penalty per non-willful failure to file an FBAR form. Most notably, in 2015, the IRS implemented a policy that "in most cases, examiners will recommend one penalty per open year, regardless of the number of unreported foreign accounts." Internal Revenue Manual 4.26.16.6.4.1.[10] Further, the FBAR instructions—drafted by the Treasury Department itself—state that "[a] person who is required to file *an FBAR* and fails to properly file may be subject to a civil penalty not to exceed $10,000 *per violation.*" Form TD F-22.1 "Instructions 'Penalties.'" (emphasis added). This term "violation" refers back to failure to file "an FBAR" and implies that the $10,000 penalty is per form. And, of course, the Treasury Department could very easily have said that the civil penalty is "not to exceed $10,000 per undisclosed account." But it didn't.

Publications by FinCEN—the Treasury Department bureau that since 1990 actually collects and uses FBAR information—likewise suggest an understanding that Section 5321(a0(5)(B)(i)'s $10,000 limit applies per form. In its publication *Financial Crimes Enforcement Network: Amendments to the Bank Secrecy Act Regulations—Reports of Foreign Financial Accounts*, 75 FR 844-01, 2010 WL 667290, at *8854 (Fed. 26, 2010), FinCEN described the FBAR penalty regime and observed that "[a] person who is required to file an FBAR and fails

---

[10]     Because Kaufman's violations occurred in 2009, 2010, and 2011, he does not receive the benefit of this policy.

to properly file may be subject to a civil penalty not to exceed $10,000." Here, FinCEN observes that the $10,000 limitation applies to each failure to properly file, rather than each undisclosed account. Again, FinCEN could have stated that a person who fails to file an FBAR is "subject to a civil penalty not to exceed $10,000 *per undisclosed account.*" But it did not.

In sum, the only reasonable interpretation of Section 5321(a)(5)(B)(i) is that it limits the non-willful FBAR penalty to $10,000 per unfiled FBAR form per year, rather than to $10,000 per undisclosed account per year. Accordingly, this Court should grant partial summary judgment in Defendant Kaufman's favor to the extent that the Government's seek more than $30,000 in penalties in this suit.

## **CONCLUSION**

The Government's Motion for Summary Judgment must be denied. For the purposes of this Motion, Defendant Kaufman concedes that the Government has established its prima facia case that Kaufman committed three non-willful FBAR violations in failing to timely file FBAR forms for Tax Years 2008, 2009, and 2010. But an important jury question remains: whether this failure was due to "reasonable cause." As discussed at length above, whether an individual acts with ordinary care is almost always a question for the jury. This is especially so where, as here, ample facts exist that could support a finding that Kaufman behaved as a reasonable and ordinarily prudent person in his circumstances.

Partial summary judgment is appropriate, however, on whether the Government can impose a penalty greater than $10,000 for each of Kaufman's late-filed FBAR forms. This is a pure question of law. For the reasons articulated above, the Court should resolve this question in Kaufman's favor and enter partial summary judgment to this effect.

Finally, it should be noted that even if the Court grants the Government's motion and enters summary judgment in its favor, that will not end the case. This court must still review whether the IRS abused its discretion in determining the amount of the imposed FBAR penalty.

Date: December 30, 2019                    Respectfully Submitted,

/s/ Jeffrey M. Sklarz
Jeffrey M. Sklarz (ct20938)
Green & Sklarz, LLC
1 Audubon Street, 3rd Fl
New Haven, CT 06511
(203) 285-8545
Fax: (203) 823-4546
jsklarz@gs-lawfirm.com

Jeffrey A. Neiman (admitted *pro hac vice*)
Marcus Neiman & Rashbaum LLP
100 Southeast Third Avenue, Suite 805
Ft. Lauderdale, Florida 33394
(954) 462-1200
jneiman@mnrlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below a copy of the foregoing was served by CM/ECF and/or mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Date:   December 30, 2019                    /s/ Jeffrey M. Sklarz