# Why the Ongoing Problem with FBAR Compliance?

*By Charles P. Rettig*

Charles P. Rettig examines the ongoing problem with FBAR compliance.

The IRS and the Department of Justice have been coordinating enforcement efforts—with mixed success—to encourage the disclosure of information regarding previously undeclared interests of U.S. persons in foreign financial accounts and assets. In 2015, to a large extent as a result of these efforts, Treasury's Financial Crimes Enforcement Network (FinCen) received a record high 1,163,229 Report of Foreign Bank and Financial Accounts (FBARs),[1] up more than eight percent from the prior year.[2] Incredibly, FBAR filings have grown on average by 17 percent per year during the last five years, according to FinCen data.[3]

Over 1 million filed FBARs sound impressive, *until* you look beyond the filings and attempt to determine the pool of those who may potentially have an FBAR reporting obligation of some sort. An estimated 8.7 million U.S. persons (excluding American military personnel) live in 160-plus countries outside the United States,[4] a figure that exceeds the populations of 37 States![5] In 2015, the IRS received 1,529,591 tax returns from individuals located outside the United States.[6]

Recent studies have suggested that a high degree of trust in government serves to increase voluntary compliance, without regard to the power of the governmental authority to actually enforce compliance.[7] Power to enforce compliance seems to have no influence on voluntary compliance in the high trust conditions, but a lack of trust in government seems to actually lower voluntary compliance. Apparently, power of trusted government authorities is perceived as legitimate, while in low trust conditions, the same power is perceived as coercive and yields negative attitudes.

The foregoing analysis seems to question the effectiveness of the extensive government enforcement efforts suggesting that almost 7.2 million Americans residing outside the United States did not even file a return, although arguably some six-plus million of them may have had some type of a U.S. filing and/or FBAR reporting obligation under current U.S. law. Notwithstanding a strong, wide-ranging international enforcement effort and an increasingly significant possibility of detection and potential punishment, enforcement efforts alone will not enhance compliance.

**CHARLES P. RETTIG** is a Principal with Hochman, Salkin, Rettig, Toscher & Perez, P.C. in Beverly Hills, California. Mr. Rettig is Past-Chair of the IRS Advisory Council, a member of the Advisory Board for the California Franchise Tax Board, a past-member of the Advisory Council for the California State Board of Equalization and a Regent and Elected Fellow of the American College of Tax Counsel.

Electronic copy available at: https://ssrn.com/abstract=2948756

Sir Winston Churchill once remarked "Those who fail to learn from history are doomed to repeat it." While struggling with similarly limited resources and declining compliance rates years ago, the IRS faced significant adverse publicity from national financial and business publications to the effect that only "chumps" choose to comply with the Internal Revenue laws.[8] Voluntary compliance suffered greatly as the IRS was characterized as being "out of control" having a perceived license to "gratuitously humiliate innocent taxpayers" in the enforcement process.[9] Subsequently, upon the conclusion of the term of IRS Charles O. Rossotti, the NY Times reported "Departing Chief says I.R.S. is Losing War on Tax Cheats."[10]

> *The perception of fairness associated with ongoing enforcement efforts will have a significant impact on the future of both domestic and international U.S. tax compliance.*

Might significant noncompliance with the FBAR reporting rules be attributable to a lack of trust in the legitimacy of the announcements by U.S. authorities of arguably lenient treatment for those who voluntarily pursue a path forward into compliance? To what extent might this perceived lack of trust be attributable to well-publicized government statements that good faith submissions under the Offshore Voluntary Disclosure Program (OVDP) and the Streamlined programs will be highly scrutinized in an effort to uncover leads for criminal prosecutions? Such statements actually serve to support admonitions of mistrust in the U.S. government by many professionals throughout the world. Burning down the village in an effort to save it is simply bad policy.

## Annual Tax Gap—$458 Billion!

The IRS recently released their latest study of the "tax gap" covering tax years 2008 through 2010, offering a broad view of the nation's compliance with federal tax laws. The IRS now estimates the average *annual* tax gap at $458 billion, and the general voluntary compliance rate at 81.7 percent.[11] The last tax gap study performed in 2006 estimated the annual tax gap at $450 billion, and the voluntary compliance rate at 83.1 percent. The gross tax gap is the difference between the amount of tax imposed on taxpayers for a given year and the amount that is paid voluntarily and timely. In dollar terms, it represents the annual amount of tax noncompliance.

The net tax gap is the gross tax gap less tax that will be subsequently collected, either paid voluntarily or as the result of IRS administrative and enforcement activities; it is the portion of the gross tax gap that will not be paid. It is estimated that $52 billion of the gross tax gap will eventually be collected resulting in a net tax gap of $406 billion. A noncompliance rate approximating 20 percent amounting to several hundred billion dollars per year is unacceptable in our self-assessment tax system, especially when you consider that a one-percent increase in voluntary compliance will increase tax receipts by about $30 billion in tax receipts!

## Eighty Percent of Nonresident Filers Have No U.S. Tax Liability!

The United States is among very few countries that tax their citizens' worldwide income, even when those citizens choose to indefinitely live abroad. Even though they have no resulting tax obligations, under FATCA, nonresident Americans are generally required to file tax returns and reports regarding their "foreign" financial accounts and assets, subject to threats of significant civil penalties and criminal sanctions. In addition, for most, their "foreign" accounts and assets are typically located in their country of residence. Such accounts are only "foreign" when viewed from a U.S. perspective.

The number of Americans living in Mexico alone is estimated at between 800,000 and 1 million while the number living in Canada is estimated at between 500,000 and 1 million.[12] Since the personal income tax rate is 35 percent in Mexico and 33 percent in Canada, presumably these Americans are not "tax cheats" seeking to conceal assets and income to avoid U.S. taxation at the maximum rate of 39.6 percent. In fact, their income would likely benefit from the foreign-earned-income exclusion, any applicable foreign tax credits, *etc*.

According to the IRS, 60 percent of claimants of the foreign-earned-income exclusion owed no tax to the United States following application of the exclusion and foreign tax credits.[13] Moreover, the National Taxpayer Advocate reported that over 80 percent of nonresident Americans who filed returns had no U.S. tax liability in 2011.[14] It would not seem unusual if many otherwise patriotic nonresident Americans having no tax liability chose to not otherwise comply with their filing and reporting obligations.

Electronic copy available at: https://ssrn.com/abstract=2948756

## Why the Record Number of Expatriations?

Outside the United States, it can be difficult for Americans to function as well as to receive competent advice. Foreign professionals are uncertain and/or mistrustful of the actual intentions of the U.S. government and often decline an otherwise meaningful engagement. Compliance by nonresidents and their advisors with U.S. reporting rules and information to be generated by FATCA has an impact. For U.S. persons with no intent to return to the United States, their citizenship may seem less important than living with the threat to impose severe civil penalties and criminal sanctions as a result of a financial account maintained in their country of residence. More nonresidents could likely identify FATCA than could likely name the Vice-President of the United States.

Each year, a record number of Americans renounce their U.S. citizenship.[15] The number of expatriations for 2015 was a 25-percent increase over 2014 and a 42-percent increase over 2013. To expatriate, the U.S. person must demonstrate they have been tax compliant for five years of IRS tax compliance by completing IRS Form 8854, *Initial and Annual Expatriation Information Statement*. For those with a net worth greater than $2 million or having average annual net income tax for the five previous years of $160,000 or more, there is an "exit tax" (imposed by Code Secs. 877 and 877A)—basically a capital gain tax as if they sold their property on their way out of the United States. Long-term residents (as defined in Code Sec. 877(e)) giving up a Green Card can also be required to pay the exit tax.

## FBAR Penalty Exposure

Under the Bank Secrecy Act, U.S. persons who have a financial interest in or signature authority over, a financial account in a foreign country with an aggregate value of more than $10,000 at any time during a particular calendar year are required to file an FBAR.[16] In general, the FBAR requires the U.S. person to identify the financial institution with which the financial account is held, the type of account (bank, securities or other), the account number and the maximum value of the account during the calendar year for which the FBAR is being filed.[17]

The Internal Revenue Manual (IRM) acknowledges that FBAR "penalties should be asserted only to promote compliance with the FBAR reporting and recordkeeping requirements. In exercising their discretion, examiners should consider whether the issuance of a warning letter and the securing of delinquent FBARs, rather than the assertion of a penalty, will achieve the desired result of improving compliance in the future."[18] "FBAR civil penalties have varying upper limits, but no floor. The examiner has discretion in determining the amount of the penalty, if any. Examiner discretion is necessary because the total amount of penalties that can be applied under the statute can greatly exceed an amount that would be appropriate in view of the violation."[19] Further, "Examiners are expected to exercise discretion, taking into account the facts and circumstances of each case, in determining whether penalties should be asserted and the total amount of penalties to be asserted."[20]

## Limits to Program FBAR Penalties

The IRS recently issued guidance to implement procedures to improve the administration of their FBAR determinations arising from participation in the ongoing IRS OVDP or the Streamlined Filing Compliance Procedures.[21] Penalties determined under the OVDP or the Streamlined Procedures are referred to as a "miscellaneous penalty" (rather than an "FBAR penalty") determined *in lieu* of all the problems a taxpayer is avoiding by coming into the OVDP or filing through the Streamlined Procedures.

The government must demonstrate a fair and balanced treatment of U.S. persons who have come forward to voluntarily report previously undeclared interests in foreign financial accounts and assets. The statutory FBAR penalty provisions only establish maximum penalty amounts, leaving the IRS to determine the appropriate FBAR penalty amount below that threshold based on the facts and circumstances of each case. In this regard, examiners have appropriately been instructed to use their best judgment when proposing FBAR penalties, taking into account all the available facts and circumstances of a case.[22]

## Willful FBAR Violations

For cases involving willful violations over multiple years, examiners will recommend a penalty for each year for which the FBAR violation was willful. In most cases, the total penalty amount for all years under examination will be limited to 50 percent of the highest aggregate balance of all unreported foreign financial accounts during the years under examination. In such cases, the penalty for each year will be determined by allocating the total penalty amount to all years for which the FBAR violations were willful based upon the ratio of the highest aggregate balance for each year to the total of the highest aggregate balances for all years combined, subject to the maximum penalty

limitation in 31 USC §5321(a)(5)(C) for each year.

Examiners may recommend a penalty that is higher or lower than 50 percent of the highest aggregate account balance of all unreported foreign financial accounts based on the facts and circumstances. The IRS guidance provides that in no event will the total willful penalty amount exceed 100 percent of the highest aggregate balance of all unreported foreign financial accounts during the years under examination.

## Nonwillful Violations

For most cases involving multiple nonwillful violations, examiners are told to recommend one penalty for each open year, regardless of the number of unreported foreign financial accounts. In those cases, the penalty for each year will be determined based on the aggregate balance of all unreported foreign financial accounts, and the penalty for each year will be limited to $10,000.

> *U.S. persons having undisclosed interests in foreign financial accounts must consult competent tax professionals before deciding the appropriate method of coming into compliance.*

For some cases, the facts and circumstances (considering the conduct of the person required to file and the aggregate balance of the unreported foreign financial accounts) may indicate that asserting nonwillful penalties for each year is not warranted. In those cases, examiners, with the group manager's approval, may assert a single penalty, not to exceed $10,000, for one year only. For other cases, the facts and circumstances (considering the conduct of the person required to file and the aggregate balance of the unreported foreign financial accounts) may indicate that asserting a separate nonwillful penalty for each unreported foreign financial account, and for each year, is warranted. In those cases, examiners, with the group manager's approval, may assert a separate penalty for each account and for each year.

The IRS guidance provides that in no event will the total amount of the penalties for nonwillful violations exceed 50 percent of the highest aggregate balance of all unreported foreign financial accounts for the years under examination. A nonwillful penalty will not be recommended if the examiner determines that the FBAR violations were due to reasonable cause and the person failing to timely file correct and complete FBARs later files correct and complete FBARs.

## Willfulness and the OVDP

The OVDP is designed for taxpayers seeking certainty in the resolution of their previously undisclosed interest in a foreign financial account. For those who might be considered to have "willfully" failed to timely file an FBAR or similar, the OVDP avoids exposure to potentially numerous other penalties associated with the income tax returns and various required foreign information reports, a detailed examination, and limits the number of tax years at issue while also providing certainty with respect to the avoidance of a referral for criminal tax prosecution. Generally, the concept of willfulness requires a "voluntary, intentional violation of a known legal duty."[23] The mere fact that a person checked the wrong box, or no box, on a Form 1040, Schedule B is not sufficient, by itself, to establish that the FBAR violation was willful.[24]

## Nonwillful Conduct Defined

Under either the Streamlined Foreign Offshore Procedures (for those who satisfy the applicable nonresidency requirement)[25] or the Streamlined Domestic Offshore Procedures,[26] U.S. persons are required to certify that their failure to report all income, pay all tax and submit all required information returns, including FBARs (FinCEN Form 114, previously Form TD F 90-22.1), was due to "non-willful" conduct (distinguishable from conduct that is "not willful"). For these procedures, "non-willful conduct" has been specifically defined as "conduct that is due to negligence, inadvertence, or mistake or conduct that is the result of a good faith misunderstanding of the requirements of the law."

The Streamlined Procedures certification process poses unique challenges to taxpayers and their representatives. The U.S. persons are expected to certify both "favorable and unfavorable facts" for failing to report income and file required information returns relating to events arising in past years. Specifically, the Certification forms (IRS Forms 14653 and 14654) require a narrative statement providing:

> Specific facts on this form or on a signed attachment explaining your failure to report all income, pay all tax, and submit all required information returns, including FBARs. Any submission that does not contain

a narrative statement of facts will be considered incomplete and will not qualify for the streamlined penalty relief.

Provide specific reasons for your failure to report all income, pay all tax, and submit all required information returns, including FBARs. Include the whole story including favorable and unfavorable facts. Specific reasons, whether favorable or unfavorable to you, should include your personal background, financial background, and anything else you believe is relevant to your failure to report all income, pay all tax, and submit all required information returns, including FBARs. Additionally, explain the source of funds in all of your foreign financial accounts/assets. For example, explain whether you inherited the account/asset, whether you opened it while residing in a foreign country, or whether you had a business reason to open or use it. And explain your contacts with the account/asset including withdrawals, deposits, and investment/ management decisions. Provide a complete story about your foreign financial account/asset. If you relied on a professional advisor, provide the name, address, and telephone number of the advisor and a summary of the advice. If married taxpayers submitting a joint certification have different reasons, provide the individual reasons for each spouse separately in the statement of facts. The field below will automatically expand to accommodate your statement of facts.

Transparency in providing both favorable and unfavorable facts in the required narrative factual statement is critically important. However, the certification forms contain little guidance as to which specific factors will assist the IRS with this process. Experienced tax professionals are likely familiar with case law and secondary source materials as to what factors bear relevance to "non-willful conduct." Expressly indicating that both "favorable and unfavorable facts" should be provided helps everyone understand that few, if any, Streamlined submissions might involve only beneficial facts. Individuals with a mixed bag of facts may still be appropriate candidates for the Streamlined Procedures.

## Why the Ongoing Problem with FBAR Compliance?

Numerous taxpayers with previously undisclosed interests in foreign financial accounts and assets have sought participation in the current OVDP (the OVDP which began in 2012 and was modified in 2014), modeled after similar programs in 2009 and 2011. Since the launch of the first OVDP in 2009, more than 54,000+ taxpayers have come into compliance voluntarily, paying at least $6.5+ billion in taxes, interest and penalties.

In June 2014, the IRS significantly expanded their Streamlined compliance procedures to encourage compliance by both nonresident and resident U.S. persons whose failure to disclose their offshore assets was "non-willful." For eligible U.S. persons residing outside the United States, all penalties are waived. For eligible U.S. persons residing in the United States, the only penalty is a miscellaneous offshore penalty equal to five percent of the foreign financial assets that gave rise to the compliance issue.

Notwithstanding these programs and significant well-publicized worldwide enforcement efforts, based on the foregoing admittedly loose analysis, at least 6 million U.S. persons remain noncompliant with their U.S. filing and reporting requirements. Why? Could it be at least partially attributable to well-publicized government statements that OVDP and Streamlined program submissions are being scrubbed in an effort to uncover leads for criminal prosecutions? With such statements how are others to trust the legitimacy of the various announcements by Service of arguably lenient treatment for those who voluntarily pursue a path forward into compliance? Who is the chump?

We live in a country founded by folks resisting the exercise of government powers in England. Recent studies have confirmed that a high degree of trust in government serves to increase voluntary compliance, without regard to the power of the governmental authority to enforce compliance.[27] Power to enforce compliance has no influence on voluntary compliance in the high trust conditions, but high power leads to even lower voluntary compliance in low trust conditions. The foregoing suggests that in high trust conditions, power of tax authorities is perceived as legitimate, while in low trust conditions, the same power is perceived as coercive and yields negative attitudes.

Verify the information submitted but, absent an egregious situation, the government should not shoot the fish that voluntarily swims into the barrel. If your neighbor filed a good faith OVDP application or a Streamlined submission and then had to defend a civil fraud examination (and a 75-percent penalty) or a criminal investigation associated with the filing, there is little chance you or others would similarly consider the same path forward. Those who in good faith pursue an OVDP application or Streamlined submission in a timely and voluntary manner should be treated fairly and with respect.

A factually accurate submission under the OVDP or the Streamlined Procedures (based on both "favorable

and unfavorable facts") should not form the foundation for a criminal prosecution. Further, the IRS Voluntary Disclosure Practice set forth in IRS IRM 9.5.11.9 would seem to provide an *informal* pass from a criminal referral by the IRS if the appropriate "bells and whistles" set forth in IRM 9.5.11.9 are followed (a "truthful, timely, complete" disclosure, "willingness to cooperate," "taxpayer makes good faith arrangements with the IRS to pay in full, the tax, interest, and any penalties determined by the IRS to be applicable," *etc.*).[28] Together with many other regulations and other similar policies,[29] these provisions have long served to properly encourage, rather than restrict, those desiring to voluntarily come into compliance.

## What to Do?

The perception of fairness associated with ongoing enforcement efforts will have a significant impact on the future of both domestic and international U.S. tax compliance. Similarly, the perception that those who voluntarily come forward were treated unfairly in some manner will have a significant, although adverse, impact on the future of U.S. tax compliance. The lesson learned from the OVDP and Streamlined programs encouraging voluntary compliance should *not* be that only "chumps" participate.

The IRS and practitioner communities have each long encouraged taxpayers to get into compliance because it is simply the right thing to do. When advised of a filing or reporting error, most noncompliant taxpayers have a strong desire to come into compliance although all will inquire about the potential consequences of doing so. Many express reluctance in believing that the government will not misinterpret or seek out some exception within OVDP or the Streamlined Procedures to pick the now low-hanging fruit.

U.S. persons having undisclosed interests in foreign financial accounts must consult competent tax professionals before deciding the appropriate method of coming into compliance. Someone desiring to be less than forthright in an OVDP application or a Streamlined submission should not proceed. *Transparency is critical to the effort*—potentially questionable issues should be appropriately disclosed.

Properly encouraging millions of resident and nonresident Americans to come into compliance is critically important to the future of our system of tax administration. From the government's perspective, the OVDP and Streamlined Procedures represent the preservation of limited enforcement resources and the ability to focus such resources elsewhere. The government should respond with a hearty "Thank you!" … not an aggressive public posture implying an effort to ferret out any potential discrepancies for the imposition of more significant penalties or criminal sanctions.

Potential government actions should consider the impact on those six-plus million U.S. people (and their advisors) sitting in the bleachers domestically or in various foreign countries trying to determine how best to pursue some form of voluntary compliance, expatriation or to possibly just continue sitting in the bleachers … "History repeats itself because no one was listening the first time."[30]

**ENDNOTES**

1. The FRBA (FinCEN Form 114) is separate from a tax return. For returns for tax years beginning after December 31, 2015, the due date for FinCEN Form 114 is changed from June 30 to April 15, and taxpayers will be allowed a six-month extension to October 15. For any taxpayer required to file an FBAR for the first time, any penalty for failure to timely request for, or file, an extension, may be waived by the IRS.
2. Foreign Account Filings Top 1 Million; Taxpayers Need to Know Their Filing Requirements (IR-2016-42, Mar. 15, 2016).
3. FinCEN Annual Report FY 2011. Previous filings were 618,134 for FY 2011; 594,488 for FY 2010; 276,386 for FY 2009; 344,967 for FY 2008; 320,937 for FY 2007; 287,356 for FY 2006; 283,895 for FY 2005; and 218,667 for FY 2004. *See* www.fincen.gov/news_room/rp/files/annual_report_fy2011.pdf.
4. The State Department estimated the nonresident citizen population at 8.7 million in 2015. *See* Bureau of Consular Affairs, *Who We Are and What We Do: Consular Affairs by the Numbers*, U.S. Dep't St. (Apr. 2015), available online at http://travel.state.gov/content/dam/travel/CA%20by%20the%20Numbers-%20May%202015.pdf. An unknown number of resident citizens, resident aliens and nonresident greencard holders hold offshore accounts that are reportable under the FBAR regime.
5. *See* https://aaro.org/about-aaro/6m-americans-abroad; *see also* https://simple.wikipedia.org/wiki/List_of_U.S._states_by_population.
6. And a total of 2,337,719 returns from outside the United States. *See* IRS Data Book, Returns Filed, Taxes Collected & Refunds Issued, available online at www.irs.gov/uac/returns-filed-taxes-collected-and-refunds-issued.
7. *See* Georgia Kaplanoglou and Vassilis T. Rapanos, *Why do people evade taxes? New experimental evidence from Greece*, 56 J. Behavioral Experimental Economics, 21–32 (June 2015).
8. *See* Janet Novack, *Are You a Chump?* Forbes Magazine (Mar. 2001).
9. Wall St. J., *Review and Outlook Opinion* (July 17, 2002).
10. David K. Johnston, New York Times, Nov. 5, 2002.
11. *See* IRS Report on the Tax Gap, available online at www.irs.gov/uac/the-tax-gap (Apr. 28, 2016).
12. Actual figures are difficult to determine given an absence of census data for Americans living outside the United States, available online at https://aaro.org/about-aaro/6m-americans-abroad; https://en.wikipedia.org/wiki/American_diaspora.
13. IRS Statistics of Income 2014 Report, note 78, at 139. For a great discussion regarding taxation of U.S. citizens living abroad, *see* Ruth Mason, *Citizenship Taxation*, Southern California Law Review, Forthcoming Virginia Law and Economics Research Paper No. 2015-07.
14. Nina E. Olson, *Taxpayer Advocate Service*, 2012 Annual Report to Congress 147 (2012), note 20, at 262.
15. *See* http://taxprof.typepad.com/taxprof_blog/2016/02/number-of-americans-renouncing-their-us-citizenship-hits-all-time-high-up-25-from-2014-560-from-bush.html.
16. 31 USC §5314(a).

[17] 31 USC §5314(a).
[18] IRM, pt. 4.26.16.4 (July 1, 2008).
[19] *Id.*
[20] *Id.*
[21] *See* Interim Guidance for Report of Foreign Bank and Financial Accounts (FBAR) Penalties (May 13, 2015), Control Number: SBSE-04-0515-0025, available online at *www.irs.gov/pub/foia/ig/spder/SBSE-04-0515-0025%5B1%5D.pdf.*
[22] *See* IRM, pt. 4.26.16.4.7, FBAR Penalties—Examiner Discretion.
[23] IRM, pt. 4.26.16.4.5.3.1 (July 1, 2008).
[24] IRM, pt. 4.26.16.4.5.3.6 (July 1, 2008).
[25] *See* U.S. Taxpayers Residing Outside the United States, Eligibility for the Streamlined Foreign Offshore Procedures, available online at *www.irs.gov/Individuals/International-Taxpayers/U-S-Taxpayers-Residing-Outside-the-United-States.*
[26] U.S. Taxpayers Residing in the United States, Eligibility for the Streamlined Domestic Offshore Procedures, available online at *www.irs.gov/Individuals/International-Taxpayers/U-S-Taxpayers-Residing-in-the-United-States.*
[27] *See* Georgia Kaplanoglou and Vassilis T. Rapanos, *Why do people evade taxes? New experimental evidence from Greece*, 56 J. Behavioral Experimental Economics, 21–32 (June 2015).
[28] "IRM 9.5.11.9 (6) Examples of timely voluntary disclosures include: (A) A letter from an attorney which encloses amended returns from a client which are complete and accurate (reporting legal source income omitted from the original returns), which offers to pay the tax, interest, and any penalties determined by the IRS to be applicable in full and which meets the timeliness standard set forth above. This is a voluntary disclosure because all of the elements of a voluntary disclosure have been met" Practice Note—if pursuing a voluntary disclosure—specifically reference example 6(a) in the lawyers cover letter accompanying the amended returns. *See also* Department of Justice, Voluntary Disclosure Policy, Section 4.01, Criminal Tax Manual, U.S. Department of Justice (2008). "Whenever a person voluntarily discloses that he or she committed a crime before any investigation of the person's conduct begins, that factor is considered by the Tax Division along with all other factors in the case in determining whether to pursue criminal prosecution … . If a putative criminal defendant has complied in all respects with all of the requirements of the Internal Revenue Service's voluntary disclosure practice, the Tax Division may consider that factor in its exercise of prosecutorial discretion. It will consider, inter alia, the timeliness of the voluntary disclosure, what prompted the person to make the disclosure, and whether the person fully and truthfully cooperated with the government by paying past tax liabilities, complying with subsequent tax obligations, and assisting in the prosecution of other persons involved in the crime."
  *See also* Department of Justice, Policy Directives and Memoranda, Section 3, Policy Directives and Memoranda, Tax Division, U.S. Department of Justice (Feb. 17, 1993) … "the Service's voluntary disclosure policy remains, as it has since 1952, an exercise of prosecutorial discretion that does not, and legally could not, confer any legal rights on taxpayers. If the Service has referred a case to the Division, it is reasonable and appropriate to assume that the Service has considered any voluntary disclosure claims made by the taxpayer and has referred the case to the Division in a manner consistent with its public statements and internal policies. As a result, our review is normally confined to the merits of the case and the application of the Department's voluntary disclosure policy set forth in Section 4.01 of the Criminal Tax Manual."
[29] Reg. §1.6664-2(c)(2) is intended to encourage voluntary compliance by permitting taxpayers to avoid accuracy-related penalties if a Qualified Amended Return is timely filed before the IRS begins an investigation of the taxpayer or the promoter of a transaction in which the taxpayer participated.
[30] Anonymous

---

This article is reprinted with the publisher's permission from the Journal of Tax Practice & Procedure, a bi-monthly journal published by CCH, a part of Wolters Kluwer. Copying or distribution without the publisher's permission is prohibited. To subscribe to the Journal of Tax Practice & Procedure or other CCH, a part of Wolters Kluwer Journals please call 800-449-8114 or visit CCHGroup.com. All views expressed in the articles and columns are those of the author and not necessarily those of CCH, a part of Wolters Kluwer or any other person.