# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| *Plaintiff*, | § | |
| | § | Civil Action No. 4:19-cv-415 |
| v. | § | Judge Mazzant |
| | § | |
| ALEXANDRU BITTNER, | § | |
| *Defendant*. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Defendant Alexandru Bittner's Motion for Partial Summary Judgment (Dkt. #28) and United States' Motion for Partial Summary Judgment (Dkt. #29). After consideration, the Court is of the opinion that Defendant Alexandru Bittner's Motion for Partial Summary Judgment (Dkt. #28) should be **GRANTED** and United States' Motion for Partial Summary Judgment (Dkt. #29) should be **GRANTED in part** and **DENIED in part**.

## BACKGROUND

### I.      Factual Summary

The dispute in this case concerns the proper interpretation of the civil penalty provided by 31 U.S.C. § 5321(a)(5)(A) and (B)(i) for a non-willful violation of the regulations implementing 31 U.S.C. § 5314. The facts giving rise to this dispute are as follows.

Defendant Alexandru Bittner is a Romanian–American dual citizen. Before emigrating to the United States, Mr. Bittner earned a Master of Science in Engineering from Politechnica University of Bucharest. In December 1982, Mr. Bittner moved to the United States, where he worked as a dishwasher and plumber and earned his master plumbing certificate in California. Mr. Bittner became a naturalized American citizen in 1987 or 1988.

After living in the United States for eight (8) years, Mr. Bittner moved back to Romania in 1990 and lived there until 2011. He *did not* renounce his American citizenship. While living in Romania, Mr. Bittner generated a considerable stream of income through a variety of businesses and investments and opened a number of foreign bank accounts. His investment ventures—including, among other things, purchasing shares in hotels, buying apartments in the name of an entity, using holding companies to hold his assets, and negotiating deals with the Romanian government to purchase government assets—indicate that he was and is a sophisticated businessman. In addition, Mr. Bittner demonstrated at least some level of awareness about his tax obligations as a United States citizen, as he filed United States income tax returns for 1991, 1997, 1998, 1999, and 2000 (Dkt. #29).

From 1990 to 2011, Mr. Bittner generated over $70 million in total income through his various foreign businesses and investment ventures. During those years, Mr. Bittner kept at least some of that income in a number of foreign financial accounts. From 1996–2011, the aggregate high balance in those foreign financial accounts exceeded $10,000. This is important because United States citizens who maintain an aggregate high balance in a foreign financial account or accounts exceeding $10,000 in any given year are required by federal law to report that financial interest to the Treasury Department. The history and framework of that law are central to this case and are worth discussing at length.

Congress enacted the Bank Secrecy Act of 1970 ("BSA"), codified at 31 U.S.C. §§ 5311–5328, in response to an increasing "unavailability of foreign and domestic bank records of customers thought to be engaged in activities entailing criminal or civil liability." *Cal. Bakers Ass'n v. Shultz*, 416 U.S. 21, 26 (1974). "[T]he express purpose of the Act [was] to require the maintenance of records, and the making of certain reports, which have a high degree of usefulness

in criminal, tax, or regulatory investigations or proceedings." *Id.* (citations omitted). As interpreted by the *Shultz* Court, "Congress was concerned about a serious and widespread use of foreign financial institutions, located in jurisdictions with strict laws of secrecy as to bank activity, for the purpose of violating or evading domestic criminal, tax, and regulatory enactments." *Id.*

The stated purpose of the BSA, as amended in 2004, is "to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism." 31 U.S.C. § 5311.

The first portion of the BSA relevant to this dispute is § 5314, which provides that:

> Considering the need to avoid impeding or controlling the export or import of monetary instruments and the need to avoid burdening unreasonably a person making a transaction with a foreign financial agency, the Secretary of the Treasury shall require a resident or citizen of the United States or a person in, and doing business in, the United States, to keep records, file reports, or keep records and file reports, when the resident, citizen, or person makes a transaction or maintains a relation for any person with a foreign financial agency.

31 U.S.C. § 5314(a). In other words, § 5314 of the BSA directs the Secretary of the Treasury to require United States residents or citizens to file reports when they maintain foreign and/or offshore bank accounts. The report(s) *must* contain the following information:

(1) the identity and address of participants in a transaction or relationship.

(2) the legal capacity in which a participant is acting.

(3) the identity of real parties in interest.

(4) a description of the transaction.

31 U.S.C. § 5314(a)(1)–(4). The Secretary of the Treasury also *may* require further detail he or she considers necessary to carry out the provisions and purpose of § 5314 or regulations promulgated thereunder. *See* 31 U.S.C. § 5314(b).

Pursuant to Congress' directive, the Secretary of the Treasury promulgated certain regulations implementing § 5314 of the BSA.   Of particular relevance here are 31 C.F.R. § 1010.350 and 31 C.F.R. § 1010.306.  Section 1010.350 provides that:

> Each United States person having a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country shall report such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists and shall provide such information as shall be specified in a reporting form prescribed under 31 U.S.C. 5314 to be filed by such persons. The form prescribed under section 5314 is the Report of Foreign Bank and Financial Accounts (TD–F 90–22.1) [("FBAR")], or any successor form.

31 C.F.R. § 1010.350(a).  And § 1010.306 provides that:

> Reports required to be filed by § 1010.350 shall be filed with [The Financial Crimes Enforcement Network ("FinCEN")] on or before June 30 of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year.

31 C.F.R. § 1010.306(d).  That is, United States residents or citizens maintaining offshore and/or foreign bank accounts with an aggregate balance exceeding $10,000 must file an FBAR form by June 30 of the year following the year to be reported.[1]

Finally, § 5321 of the BSA authorizes the Secretary of the Treasury to penalize United States residents or citizens who violate the regulations implementing § 5314.  *See* 31 U.S.C. § 5321(a)(5)(A).   Until 2004, the penalty for failing to comply with the reporting requirements set out by the Secretary of the Treasury's implementing regulations attached only to willful reporting violations.  In 2004, Congress amended the BSA to its current form to provide penalties for non-willful violations as well.  The civil penalty provisions are as follows:

---

[1] The FBAR used to be filed by mail via form TD 90-22.1.  But now the form is FinCEN Form 114, which is submitted electronically.

**(5) Foreign financial agency transaction violation.**—

    **(A) Penalty authorized.**—The Secretary of the Treasury may impose a civil money penalty on any person who violates, or causes any violation of, any provision of section 5314.

    **(B) Amount of penalty.**—

        **(i)  In general.**—Except as provided in subparagraph (C), the amount of any civil penalty imposed under subparagraph (A) shall not exceed $10,000.

        **(ii)  Reasonable cause exception.**—No penalty shall be imposed under subparagraph (A) with respect to any violation if—

            **(I)**  such violation was due to reasonable cause, and

            **(II)** the amount of the transaction or the balance in the account at the time of the transaction was properly reported.

    **(C) Willful violations.**—In the case of any person willfully violating, or willfully causing any violation of, any provision of section 5314—

        **(i)**  the maximum penalty under subparagraph (B)(i) shall be increased to the greater of—

            **(I)**  $100,000, or

            **(II)** 50 percent of the amount determined under subparagraph (D), and

        **(ii)**  subparagraph (B)(ii) shall not apply.

    **(D) Amount.**—The amount determined under this subparagraph is—

        **(i)**  in the case of a violation involving a transaction, the amount of the transaction, or

        **(ii)**  in the case of a violation involving a failure to report the existence of an account or any identifying information required to be provided with respect to an account, the balance in the account at the time of the violation.

31 U.S.C. § 5321(a)(5).

5

From 1996–2011, Mr. Bittner was a United States citizen and maintained an aggregate balance of more than $10,000 in foreign financial accounts. But he did not timely file FBARs for any of those years until May 2012.[2] In response, in June 2017, the IRS assessed the following penalties against Mr. Bittner for non-willful FBAR violations under 31 U.S.C. § 5321(a)(5)(A) and (B)(i):

| Year | Total Number of Mr. Bittner's Accounts Penalized | Amount of FBAR Penalties Sought by Summary Judgment |
|------|------|------|
| 2007 | 61 | $610,000 |
| 2008 | 51 | $510,000 |
| 2009 | 53 | $530,000 |
| 2010 | 53 | $530,000 |
| 2011 | 54 | $540,000 |
| **Total** | **272** | **$2,720,000** |

(Dkt. #29 at p. 6).[3] The Government filed this action to reduce its penalty assessment to judgment, seeking a total of $2,720,000 in penalties against Mr. Bittner. The Government's motion for partial summary judgment, however, seeks only $1,770,000 in penalties, computed on the basis of the number of foreign accounts Mr. Bittner admitted to maintaining from 2007–2010. The Government seeks partial summary judgment on the following (Dkt. #29 at p. 7):

| Year | Total Number of Mr. Bittner's Accounts Penalized | Amount of FBAR Penalties Sought by Summary Judgment |
|------|------|------|
| 2007 | 51 | $510,000 |
| 2008 | 43 | $430,000 |
| 2009 | 42 | $420,000 |
| 2010 | 41 | $410,000 |
| **Total** | **177** | **$1,770,000** |

Mr. Bittner disputes the amount of the civil penalties assessed against him for his non-willful failure to file FBARs for 2007–2010. Specifically, he argues that the non-willful civil

---

[2] The Government's motion indicates that in September 2013, Mr. Bittner filed amended FBARs for the years 2006–2010 (Dkt. #29 at p. 6).
[3] The IRS elected not to assess any FBAR penalties against Mr. Bittner for the years 1996–2006 (Dkt. #29 at p. 5).

penalty provided under 31 U.S.C. § 5321(a)(5)(A) and (B)(i) applies per annual FBAR report not properly or timely filed, not per foreign financial account maintained.  The Government argues that the non-willful FBAR penalty applies per foreign financial account maintained but not properly or timely reported on an annual FBAR.  Thus, both Mr. Bittner and the Government ask the Court to interpret 31 U.S.C. § 5321(a)(5)(A) and (B)(i) and answer the following question: Does the civil penalty provided by 31 U.S.C. § 5321(a)(5)(A) and (B)(i) for non-willful violation(s) of the regulations implementing 31 U.S.C. § 5314 apply per foreign financial account maintained per year but not properly or timely reported on an annual FBAR, or per annual FBAR report not properly or timely filed?

## II.     Procedural History

On March 11, 2020, Mr. Bittner filed a motion for partial summary judgment (Dkt. #28). On April 2, 2020, the Government filed a response (Dkt. #42).  On April 24, 2020, Mr. Bittner filed a reply (Dkt. #53).

On March 12, 2020, the Government filed a motion for partial summary judgment (Dkt. #29).  On April 18, 2020, Mr. Bittner filed a response (Dkt. #47).  On May 4, 2020, the Government filed a reply (Dkt. #56).  On May 11, 2020, Mr. Bittner filed a sur-reply (Dkt. #61).

On March 18, 2020, the Patels filed a motion for leave to file an amicus brief on behalf of Mr. Bittner's motion for partial summary judgment and for leave to exceed the page limits (Dkt. #32).  Contemporaneously with that motion, the Patels filed their amicus brief (Dkt. #33). On March 27, 2020, the Patels filed an amended amicus brief (Dkt. #34).  On March 30, 2020, the Government filed a response, opposing the Patel's motion for leave to file an amicus brief (Dkt. #36).  On March 31, 2020, Mr. Bittner filed a response opposing the Patel's motion for leave to file an amicus brief (Dkt. #38).  On May 11, 2020, the Court granted the Patel's motion to file

their amicus brief and deemed their amended amicus brief filed (Dkt. #59).  On May 18, 2020, the Government filed a response in opposition to the Patel's amended amicus brief (Dkt. #63).

On May 4, 2020, the Patels filed a reply brief in support of Mr. Bittner's motion for partial summary judgment (Dkt. #58).  On May 18, 2020, the Government filed a sur-reply (Dkt. #62).

On July 4, 2020, the Court held a hearing on the United States' and Mr. Bittner's cross motions for partial summary judgment.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  Substantive law identifies which facts are material.  *Id.*  The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment."  *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact.  FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323.  If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or

defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).

Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

This is a matter of first impression in the Fifth Circuit and presents the Court with the task of interpreting the non-willful civil penalty provided by 31 U.S.C. § 5321(a)(5)(A) and (B)(i).

First, the Court examines the text of 31 U.S.C. § 5321(a)(5)(A) and (B)(i) and analyzes it in light of the statutory and regulatory framework in which it appears. The Court concludes that non-willful FBAR violations relate to each FBAR form not timely or properly filed rather than to each foreign financial account maintained but not timely or properly reported. In so doing, the Court considers and rejects the Government's arguments for why non-willful FBAR violations

relate to each foreign financial account and discusses how Mr. Bittner's proposed interpretation of 31 U.S.C. § 5321(a)(5)(A) and (B)(i) would avoid absurd outcomes that Congress could not have intended in passing the non-willful FBAR provision.

Second, the Court looks at the parties' arguments respecting the rule of lenity. While the Court is apprehensive about whether the rule of lenity applies here, it concludes that, to the extent the rule of lenity does apply, it would tend to support Mr. Bittner's proposed interpretation of 31 U.S.C. § 5321(a)(5)(A) and (B)(i).

Third, the Court examines the most factually analogous case to the present action—*United States v. Boyd*—and respectfully declines to follow its reasoning and outcome.

Fourth, the Court rejects as moot Mr. Bittner's Eighth Amendment challenge.

Fifth, and finally, the Court concludes that there is no genuine issue of material fact as to whether the non-willful civil penalties assessed against Mr. Bittner are excused under the reasonable cause exception and enters judgment as a matter of law in the Government's favor.

## I.     31 U.S.C. § 5321(a)(5)(A) and (B)(i)

In cases involving construction of a statute, the Court begins its analysis with the text itself. *Watt v. Alaska*, 451 U.S. 259, 265 (1981). That said, when interpreting statutory text, the Court does not read statutory provisions in isolation; rather, it is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 320 (2014). The Court will therefore analyze the statutory and regulatory framework as a whole and then examine the meaning of the statutory provisions "with a view to their place" in that framework. *See id.*

Subparagraph (A) of the statute begins by providing that "[t]he Secretary of the Treasury may impose a civil money penalty on any person who violates, or causes any violation of, any provision of section 5314." 31 U.S.C. § 5321(a)(5)(A). The following subsection then provides that "the amount of any civil penalty imposed under subparagraph (A) shall not exceed $10,000." 31 U.S.C. § 5321(a)(5)(B)(i). Thus, the statute provides for a singular civil money penalty, capped at $10,000, that attaches to each violation of § 5314. The question then becomes: What constitutes a "violation" within the meaning of the statute?

As the Supreme Court recognized in *Shultz*, "the [BSA's] civil and criminal penalties attach only upon violation of regulations promulgated by the Secretary; if the Secretary were to do nothing, the Act itself would impose no penalties on anyone." 416 U.S. at 26. It is therefore violations of the Secretary of the Treasury's implementing regulations to which § 5321(a)(5)'s civil penalties attach. Those regulations provide that "[t]he form prescribed under section 5314 is the [FBAR], or any successor form," and that such form must be filed "on or before June 30 of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year." 31 C.F.R. §§ 1010.350(a), .306. Accordingly, it is the failure to file an annual FBAR that is the violation contemplated and that triggers the civil penalty provisions of § 5321.

Up to this point, the parties agree. They disagree, however, about whether an FBAR reporting deficiency constitutes a *single* violation, or whether each foreign financial account not properly or timely reported on an FBAR constitutes a *separate* reporting violation. In other words, they disagree about whether the number of "violations" that occur when an account holder commits an FBAR reporting deficiency varies with the number of accounts maintained by that account holder that were not properly reported. To resolve this disagreement, the Court looks to

11

§ 5321(a)(5)(A) and (B)(i) in conjunction with the rest of the statute's text—particularly, the willfulness provision and reasonable cause exception.

The willfulness provision provides a penalty for willful FBAR violations in an amount equal to the greater of $100,000 or 50 percent of either "the amount of the transaction" or "the balance in the account at the time of the violation."  31 U.S.C. § 5321(a)(5)(D)(i)–(ii).  More specifically, when an account holder's violation involves a willful "failure to report the existence of an account or any identifying information required to be provided with respect to an account," the penalty may relate to the balance in that account at the time of the violation. *Id.*  Thus, Congress clearly knew how to make FBAR penalties account specific—it did so, in no uncertain terms, for willful violations.  And the willfulness provision was part of the statutory scheme well before Congress amended the BSA in 2004 to add the non-willfulness provision.  Congress therefore had a template for how to relate an FBAR reporting penalty to specific financial accounts, and the fact that it did not do so for non-willful violations is persuasive evidence that it intended for the non-willful penalties not to relate to specific accounts.  *See Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006) ("A familiar principle of statutory construction . . . is that a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute.");  *see also Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

The same goes for the reasonable cause exception.  Under the reasonable cause exception—§ 5321(a)(5)(B)(ii)—an individual who commits a non-willful FBAR violation is not

assessed a civil penalty if that violation was due to reasonable cause and "the amount of the transaction or the balance in the account at the time of the transaction was properly reported." 31 U.S.C. § 5321(a)(5)(B)(ii)(I)–(II). Congress therefore related the reasonable cause exception to "balance in the account" and could have done the same when defining the non-willful FBAR violation and penalty. But it did not. Tellingly, Congress passed the non-willful civil penalty provision—§ 5321(a)(5)(B)(i)—and the reasonable cause exception *together*. They are part of the exact same statutory scheme, passed by the exact same Congress at the exact same time. Congress knew what it was doing when it drafted the non-willful civil penalty without any reference to "account" or "balance in the account," and the Court will presume that Congress acted intentionally in doing so.

That the penalty for a "violation" within the meaning of § 5321(a)(5)(A) relates to the FBAR form, rather than to each individual account maintained, makes sense in light of the overall statutory and regulatory scheme. First, and most generally, the BSA is a reporting statute that aims to "avoid burdening unreasonably a person making a transaction with a foreign financial agency." 31 C.F.R. § 5314(a). For this reason, individuals who are required to file an FBAR are obligated to file *only one* report per year. It stands to reason that a "violation" of the statute would attach directly to the obligation that the statute creates—the filing of a single report—rather than attaching to each individual foreign financial account maintained. A closer look at the FBAR form confirms this reasoning.

The instructions on the FBAR form make clear that no FBAR is required if an individual's aggregate foreign account balance does not exceed $10,000. (Dkt. #28, Exhibit 6) ("No report is required if the aggregate value of the accounts did not exceed $10,000."). Regardless of whether an individual maintains 5, 25, or 500 accounts, the aggregate balance must exceed $10,000 to

trigger the FBAR reporting obligation. Absent some directive from Congress indicating otherwise, it would make little sense to read § 5321(a)(5)(A) and (B)(i) to impose per-account penalties for non-willful FBAR violations when the number of foreign financial accounts an individual maintains has no bearing whatsoever on that individual's obligation to file an FBAR in the first place.

The Government advances two primary arguments for why non-willful FBAR violations relate to specific financial accounts rather than to FBAR forms. First, the Government argues that, because the reasonable cause exception forgives the penalty for a non-willful FBAR violation and references the "balance in the account," the non-willful violation itself must relate to each account. That is, if the exception applies on an account-by-account basis, then the violation that the exception forgives must also apply on an account-by-account basis. While the Court recognizes this logic, it is unpersuaded. The Government has not provided any good reason for why the exception to a rule should somehow inform the calculation of the penalty for a violation of that rule. Here, Congress assesses a maximum $10,000 fine for a non-willful violation—which is an account holder's non-willful failure to submit her annual FBAR—while also providing a statutorily permissible excuse for noncompliance—the reasonable cause exception—that is completely independent from the violation itself. It does not follow that the *penalty* is calculated on an account-by-account basis just because Congress provided that a taxpayer's accurate reporting of the balance in her account(s) is a possible ground for *excusing* that penalty. Congress can forgive non-willful FBAR violations any way it likes—even in ways that have nothing to do with the underlying violation. And *why* Congress elected to forgive non-willful FBAR violations in the particular way it did is not the issue before this Court; any attempt by this Court to comment

on why the reasonable cause exception mentions "balance in the account" while the penalty provision does not would be pure conjecture.[4]

The Government also argues that, because the penalty for willful violations simply modifies the penalty for non-willful violations, the underlying violation must also be the same. And because "the willful variant of the penalty is assessed with reference to each account," the non-willful variant of the penalty should also be understood to relate to each account (Dkt. #29). The Court acknowledges that the willful and non-willful variants of the penalty are connected, but the problem with this argument is it overlooks the fact that Congress may have had perfectly good reasons for choosing to compute the penalty for willful violations different from the penalty for non-willful violations. Indeed, willful violators pose a fundamentally different obstacle to the Government's ability to monitor foreign financial transactions than non-willful violators do, and perhaps Congress drafted the provisions with different language to reflect those differences.[5] Ultimately, the most the Court can safely do is rely on the plain language that appears in the statute; because the penalty for willful violations includes explicit reference to "the existence of an account" and "the balance in the account" while the penalty for non-willful violations does not, the Court can infer that Congress intended the penalty for willful violations to relate to specific accounts and the penalty for non-willful violations not to.

Another virtue of adopting Mr. Bittner's proposed interpretation of § 5321(a)(5)(A) and (B)(i) is that it would avoid absurd outcomes that Congress could not have intended in drafting the statute. Consider a few examples. First, imagine two similarly situated individuals who each

---

[4] What the Government also fails to consider is that the reasonable cause exception does not necessarily apply on an account-by-account basis. An account holder may be entitled to invoke the reasonable cause exception to avoid paying the non-willful civil penalty by having shown reasonable cause and having properly reported "the amount of the transaction." *See* 31 U.S.C. § 5321(a)(5)(B)(ii)(II). Thus, it is not necessarily the case that the reasonable cause exception, and by extension the underlying non-willful FBAR violation, relate to specific financial accounts because they can instead relate to "transactions."

[5] For example, Congress specifically excluded the reasonable cause safe harbor from the willfulness provision.

maintain $1 million per year in various foreign financial accounts.  The first individual maintains two (2) accounts, each with $500,000; the second individual, wanting to avoid the risks of keeping too much of her money tied up in the same place, maintains twenty (20) accounts, each with $50,000.  Suppose each individual non-willfully fails to file an FBAR in a certain year, but after realizing her misstep, files a late FBAR properly reporting her foreign financial accounts.  Under the Government's interpretation of § 5321(a)(5)(A) and (B)(i), the first individual would be assessed up to $20,000 in civil penalties, and the second individual would be assessed up to $200,000 in civil penalties.  But nothing in the plain language of the statute or in Congress' declaration of purpose indicates that Congress intended to treat those two individuals differently.  Indeed, Congress' purpose was to "require certain reports or records where they have a high degree of usefulness in . . . tax[] or regulatory investigations or proceedings," and each equally failed to provide that report to Congress; as such, it would be odd not to penalize them equally.  31 U.S.C. § 5311.

The natural retort to this hypothetical, and one the Government makes in its motion, is to argue that it would be absurd to treat someone who fails to list just one or two foreign accounts per year the same as someone who fails to list twenty.  The Government reasons that "hidden foreign accounts increase[] the costs of an investigation and the potential damage to the government in lost tax revenue.  Thus, making the penalty vary by the number of undisclosed accounts satisfies the remedial purpose" (Dkt. #29).

While the Government's concern is legitimate, it is overstated.  In the first place, the Court does not see any connection between the *number* of foreign financial accounts unreported and lost tax revenue.  Whether an individual holds $1 million in taxable income in one foreign account or ten foreign accounts makes no difference—as far as this Court is aware—as to how much she owes

16

the IRS in taxes.  $1 million in taxable income is $1 million in taxable income, no matter how you slice it.[6]  Second, while the Court recognizes that there may be higher costs associated with investigating twenty accounts as compared to investigating two, the Court is not persuaded that this carries the day for the Government.  For starters, while investigation costs are a significant concern, that concern is simply not strong enough to compel the Court to read into § 5321(a)(5)(A) and (B)(i) a word that is not there.  Moreover, the statutory and regulatory scheme effectively limits the costs that would be associated with investigating the account records of non-willful violators.  Individuals with an interest in fewer than twenty-five (25) foreign accounts are required to provide account-specific information to the Government on the FBAR form itself.  And for those with an interest in twenty-five (25) or more foreign accounts, while they need not provide account-specific information on the FBAR itself, the Secretary of the Treasury's implementing regulations place the burden of production of account-specific information on the account holder, requiring them to "provide detailed information concerning each account *when so requested* by the Secretary or his delegate."  31 C.F.R. § 1010.350(g)(1) (emphasis added).  Thus, while the Court recognizes that concern over investigation costs is legitimate, the Court is not persuaded that concern over those costs should change its analysis of the statute's meaning.[7]

Now consider a second example, which Mr. Bittner brought to the Court's attention in his motion.  Imagine two individuals, each with interests in twenty (20) foreign financial accounts.  Suppose the first individual maintained an aggregate foreign financial account balance of $180,000

---

[6] It is also worth noting that the Secretary of the Treasury's implementing regulations contain separate income tax reporting requirements that are independent of the FBAR reporting requirements.  *See Shultz*, 416 U.S. at 37.  It appears, therefore, that Congress contemplated the income tax ramifications relating to offshore/foreign financial accounts and addressed them in provisions separate from the FBAR-related provisions.

[7] Even more to this point, to the extent there is any concern whatsoever that an account holder may not produce the appropriate records upon request, thereby shifting the burden and costs of investigation to the Government, that concern is misplaced.  Such conduct would risk transforming an otherwise non-willful violation into a willful violation, for which per-account penalties may apply.

in a certain year and *willfully* failed to file an FBAR.  And suppose a second individual maintained an aggregate foreign financial account balance of $100,000 in that same year and *non-willfully* failed to file an FBAR.  Pursuant to § 5321(a)(5)(C) and (D), the first individual would be subject to a $100,000 penalty.  But the second individual—the non-willful violator—would be subject to up to $200,000 in penalties under the Government's interpretation of § 5321(a)(5)(A) and (B)(i).  And this, despite having acted non-willfully and having *less* money in foreign financial accounts than the willful violator.  That kind of outcome cannot be what Congress intended in passing § 5321(a)(5)(A) and (B)(i).

The Court is persuaded that non-willful FBAR reporting deficiencies constitute a single violation within the meaning of § 5321(a)(5)(A) and (B)(i) and carry a maximum annual $10,000 civil money penalty, irrespective of the number of foreign financial accounts maintained.  This interpretation of the non-willful civil penalty is consistent with the plain language of the BSA when considered in view of the overall statutory and regulatory scheme, advances Congress' and the Secretary of the Treasury's stated purposes, and avoids absurd outcomes that would result if the non-willful civil penalty related to specific financial accounts.

## II.     The Rule of Lenity

Mr. Bittner also argues that the rule of lenity supports his position.  Specifically, he argues that, because the BSA imposes penalties, the rule of lenity dictates that any ambiguities in the statute should be resolved in his favor.  The Government responds by arguing that the rule of lenity is inapplicable here because, after careful review of the statute's text and structure, there is no ambiguity.

The rule of lenity is a principle of statutory construction that "applies primarily to the interpretation of criminal statutes."  *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S.

18

1, 16 (2011).  It dictates that courts resolve ambiguities in criminal statutes in favor of defendants.

*See Crandon v. United States*, 494 U.S. 152, 168 (1990).  Although the paradigmatic application

of the rule of lenity occurs in the context of criminal statutes, it can "apply when a statute with

criminal sanctions is applied in a noncriminal context."  *Id.* (citing *Leocal v. Ashcroft*, 543 U.S. 1,

11 n.8 (2004)).  The rationale behind the rule of lenity is that "fair warning should be given to the

world in language that the common world will understand, of what the law intends to do if a certain

line is passed."  *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 n.18

(1995) (first quoting *United States v. Bass*, 404 U.S. 336, 347–350 (1971); then quoting *McBoyle

v. United States*, 283 U.S. 25, 27 (1931)).  In other words, courts are to interpret statutes with civil

and criminal applications consistently so that defendants have fair notice as to what conduct the

statute prohibits.

At the outset, the Court is dubious as to whether the non-willful civil penalty in the BSA

is even the *kind* of statutory provision to which the rule of lenity applies.  To be sure, the BSA

does provide criminal penalties.  *See* 31 U.S.C. § 5322.  Those criminal penalties, however, apply

only to violators who acted willfully, *see* 31 U.S.C. § 5322(a)–(b), and the civil penalty at issue

here, of course, is the non-willful civil penalty.  Thus, the culpability level required to trigger the

BSA's criminal penalty—willfulness—is not present here.  It would be an easier call if the Court

were interpreting the BSA's willful civil penalty—in that case, the culpability levels of the criminal

and civil penalties would "match," and the rule of lenity would ensure consistent interpretation of

the criminal and civil penalties.  But because there is no criminal analog to the non-willful civil

penalty—that is, a criminal penalty enforceable upon a showing of only non-willfulness—the

Court is apprehensive about employing the rule of lenity as a tool of statutory construction here.

That said, to the extent that the BSA is the kind of statute to which the rule of lenity applies, there is another hurdle to overcome.  "[T]he rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended."  *Barber v. Thomas*, 560 U.S. 474, 486–88 (2010) (citation and internal quotation marks omitted).  Courts "do not resort to the rule of lenity every time a difficult issue of statutory interpretation arises."  *Joffe v. Google, Inc.*, 746 F.3d 920, 935 (9th Cir. 2013).  Rather, "[o]nly where 'the language or history of [the statute] is uncertain' after looking to 'the particular statutory language, . . . the design of the statute as a whole and to its object and policy,' does the rule of lenity serve to give further guidance."  *Maracich v. Spears*, 570 U.S. 48, 76 (2013) (quoting *Crandon*, 494 U.S. at 158).

Here, the Court can do much better than "simply guess as to what Congress intended."  *See Barber*, 560 U.S. at 486–88.  As discussed, *supra*, the text, structure, and purpose of the statute unambiguously point to the conclusion that the non-willful civil penalty applies per FBAR reporting violation rather than per account.  So, the best the Government could do here is advance a reasonable alternative interpretation of the statute, in which case the rule of lenity would counsel in favor of adopting Mr. Bittner's position.  Accordingly, to the extent the rule of lenity is applicable in this context, it supports Mr. Bittner's proposed interpretation of the non-willful civil penalty.

One final note on this point.  The Court is aware of cases that, without referencing explicitly the rule of lenity, stand for the general proposition that tax statutes imposing penalties are to be strictly construed.  For example, in *Commissioner v. Acker*, the Supreme Court stated: "We are here concerned with a taxing Act which imposes a penalty.  The law is settled that 'penal statutes are to be construed strictly,' and that one 'is not to be subjected to a penalty unless the words of

the statute plainly impose it.'" 361 U.S. 87, 91 (1959) (quoting *Fed. Commc'ns Comm'n v. Am. Broad. Co.*, 347 U.S. 284, 296 and *Keppel v. Tiffin Sav. Bank*, 197 U.S. 356, 362 (1905)); *see also Bradley v. United States*, 817 F.2d 1400, 1402–03 (9th Cir. 1987) ("A tax provision which imposes a penalty is to be construed strictly; a penalty cannot be assessed unless the words of the provision plainly impose it.").

This principle is not dispositive on the issue here; the Court is of the opinion that the statute is unambiguous and therefore need not appeal either to the rule of lenity or to the general notion that tax penalties are to be strictly construed in order to reach its conclusion. But if such a principle were at play here, it would further support the Court's conclusion that § 5321(a)(5)(A) and (B)(i) should be interpreted to impose the non-willful civil penalty on a per-FBAR, rather than per-account, basis.

## III.  *United States v. Boyd*

The Government's last remaining hope is for the Court to find persuasive the reasoning and outcome in *United States v. Boyd*, which presents the most analogous case to the present action. No. CV 18-803-MWF, 2019 WL 1976472 (C.D. Cal. Apr. 23, 2019).[8]  It does not. But because it is the case that the parties brief in the most detail, the Court will examine it thoroughly.

In *Boyd*, the IRS assessed the defendant thirteen (13) separate FBAR penalties after it determined that she had non-willfully failed to report her financial interest in fourteen (14) foreign

---

[8] This case is on appeal to the United States Court of Appeals for the Ninth Circuit. *United States v. Boyd*, No. CV 18-803-MWF, 2019 WL 1976472 (C.D. Cal. Apr. 23, 2019), *appeal docketed*, No. 19-55585 (9th Cir. May 22, 2019).  It is currently set for oral argument on September 1, 2020.

financial accounts.  *Id.* at *1–2.  In so doing, the IRS considered each account not listed on a timely filed FBAR as a separate violation.  *Id.*

The Government filed suit to reduce its penalty assessment to judgment, and the defendant disputed the amount of non-willful civil penalties assessed against her.  The issue there was the same as it is here: Does the non-willful FBAR penalty relate to each annual FBAR not properly or timely filed, or each foreign financial account maintained but not properly or timely reported on that FBAR?  Much like here, the Government argued that per-account FBAR penalties were proper and, for support, pointed to the language of the reasonable cause exception and the fact that "Congress selected the singular forms of 'account' and 'balance,' indicating that a violation relates to one, and only one account."  *Id.* at *4.  The defendant argued that, had Congress intended the non-willful civil penalty to relate to each foreign financial account, it would have specified as much in the statute's text.

The *Boyd* court, without any explanation, held that "given the relevant language the Government highlights above, the Court determines that the Government has advanced the more reasonable explanation."  *Id.*  The *Boyd* court did not elaborate on *why* the Government's interpretation was the more reasonable one, which is quite unfortunate, as this Court is evaluating the same arguments here as the parties made in *Boyd*.

It goes without saying that the outcome in *Boyd* is not binding precedent on this Court.  But beyond that, the Court respectfully disagrees with the reasoning and outcome in *Boyd*.  As the Court has already discussed, *supra*, the language of the reasonable cause exception is not a sound basis for reading a word into the penalty provision that is not there.  Congress knew how to use the word "account," as it did so elsewhere in the statute.  Its inclusion in certain provisions and its

exclusion elsewhere must have meaning, but the Government's proposed interpretation, and the *Boyd* court's acceptance of that interpretation, require this Court to ignore that meaning.

The Court is weary of creating conflicts with its sister district courts—even those in other circuits. It is particularly hesitant to do so when interpreting a federal statute, which theoretically should have uniform meaning nationwide. But the *Boyd* court's analysis fails to provide adequate guidance as to how it reached the conclusion it did. After a careful analysis of the statute's text and purpose, the Court is left with no choice but to respectfully disagree with the outcome in *Boyd* and reach the opposite conclusion.[9]

The Government further claims that, in addition to *Boyd*, there are other cases that have held that § 5321(a)(5)(A) and (B)(i)'s non-willful civil penalty provision relates to each foreign financial account maintained. *See* (Dkt. #42) (citing *United States v. Ott*, No. 18-cv-12174, 2019 WL 3714491 (E.D. Mich. Aug. 7, 2019) and *United States v. Gardner*, No. 2:18-cv-03536-CAS-E, 2019 WL 1767120 (C.D. Cal. Apr. 22, 2019)). But this is misleading. The courts in *Ott* and *Gardner* each were presented only with the question whether the penalties for the defendant's non-willful FBAR violations were excused under the reasonable cause exception. The *Ott* and *Gardner*

---

[9] Although not dispositive of the outcome in *Boyd*, the *Boyd* court briefly addressed the rule of lenity in its opinion. Its discussion is as perplexing as it is brief. The *Boyd* court pointed out, without taking a position one way or another, that there is case law supporting "the argument that a rule of lenity should apply here." *Boyd*, 2019 WL 1976472, at *5. The *Boyd* court then went on to say:

> But that does not decide the issue. Even if a rule of lenity applies, that only dictates that the Court should choose the more lenient of two reasonable interpretations. In light of the prominence of "transactions" and "accounts" in the language of section 5321, the Court determines that the statute contemplates that the relationship with each foreign financial account constitutes the non-willful FBAR violation.

*Id.* Even after assuming arguendo that the rule of lenity did apply, the *Boyd* court still adopted the Government's interpretation of § 5321(a)(5)(A) and (B)(i). As the Government's interpretation clearly is not the more lenient one, it follows that the *Boyd* court must have viewed Ms. Boyd's proposed interpretation as an *unreasonable* one. This outcome is difficult to justify—especially in view of the *Boyd* court's earlier statement that "the Court views section 5321 as somewhat unclear" and its citation to a secondary source standing for the proposition that "Section 5321 is unclear as to whether the $10,000 negligence penalty applies per year or per account." *Id.* at *4 (citing 1 ROBERT S. FINK, TAX CONTROVERSIES—AUDITS, INVESTIGATIONS, TRIALS § 17.03 (2018)). In the Court's view, this illustrates yet another flaw in the *Boyd* court's reasoning.

courts took for granted that the penalties assessed by the IRS—which were computed on a per account, rather than per form basis—were proper.  Because the question presented here was not before the court in either *Ott* or *Gardner*, neither case helps this Court in interpreting § 5321(a)(5)(A) and (B)(i).

To conclude, Congress used the word "account" or "accounts" over one hundred (100) times throughout the BSA.  But remarkably, it omitted any mention of "account" or "accounts" in § 5321(a)(5)(A) and (B)(i).  At the end of the day, the Court will not insert words into statutes that are not there.  *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015) ("The problem with this approach is the one that inheres in most incorrect interpretations of statutes: It asks us to add words to the law to produce what is thought to be a desirable result.  That is Congress's province.  We construe [a statute's] silence as exactly that: silence."); *62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 596 (1951) ("After all, Congress expresses its purpose by words.  It is for us to ascertain—neither to add nor to subtract, neither to delete nor to distort."); *see also King v. Burwell*, 135 S. Ct. 2480, 2505 (2015) (Scalia, J., dissenting) (quoting *Pavelic & LeFlore v. Marvel Entertainment Group, Div. of Cadence Indus. Corp.*, 493 U.S. 120, 126 (1989)) ("They made Congress, not this Court, responsible for both making laws and mending them.  This Court holds only the judicial power—the power to pronounce the law as Congress has enacted it. . . . We must always remember, therefore, that '[o]ur task is to apply the text, not to improve upon it.'").  Congress knew how to make the non-willful FBAR penalty vary with the number of foreign financial accounts maintained, but it did not do so. That is the end of the road.

Non-willful FBAR penalties apply on a per form, rather than per account basis.  Mr. Bittner

is therefore obligated to pay a maximum $10,000 penalty for each year he non-willfully failed to

timely or properly file an FBAR.

## IV.    Eighth Amendment

Mr. Bittner argues that the penalties assessed him by the IRS—totaling just shy of $3

million for his numerous non-willful FBAR violations—constitute an "excessive fine" in violation

of the Eighth Amendment to the United States Constitution (Dkt. #47 at p. 16).

The Court's understanding of Mr. Bittner's argument on Eighth Amendment grounds is

that it is premised on the Court finding the Government's $3 million penalty assessment proper.

In view of the Court's interpretation of the non-willful FBAR penalty, however, the Court need

not address the merits of Mr. Bittner's Eighth Amendment argument, as it is now moot.

## V.    Reasonable cause

Finally, the Government argues in its motion that Mr. Bittner's non-willful FBAR

violations were not due to reasonable cause and seeks summary judgment as to the same.  In his

cross motion, Mr. Bittner claims—albeit in a one-sentence footnote—that there is a genuine issue

of material fact as to whether he qualifies for the statutory exemption from the non-willful FBAR

penalty.

Neither the BSA nor the Secretary of the Treasury's implementing regulations provide a

definition of "reasonable cause" within the meaning of § 5321(a)(5)(B)(ii).  Courts interpreting

the reasonable cause exception have been resigned to look elsewhere for guidance as to what kind

of conduct falls within its limits.  *Ott*, 2019 WL 3714491, at *2; *Moore v. United States*, No. C13-

2063RAJ, 2015 WL 1510007, at *4 (W.D. Wash. Apr. 1, 2015); *Jarnagin v. United States*, 134

Fed. Cl. 368, 376 (2017).  In that vein, "reasonable cause" appears in other statutes governing taxes

and tax-related penalties.  *See, e.g.*, *Moore*, 2015 WL 1510007, at *4 (citing 26 U.S.C. §§ 6664(c)(1), 6677(d), and 6651(a)(1)); *see also Bragdon v. Abbott*, 524 U.S. 624, 631 (1998) ("Congress' repetition of a well-established term carries the implication that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations.")

In *Congdon v. United States*, the Court interpreted a reasonable cause exception that was similar to the reasonable cause exception in § 5321(a)(5)(B)(ii) and applied the following standard:

> Reasonable cause is based on all the facts and circumstances in each situation and allows the IRS to provide relief from a penalty that would otherwise be assessed.  Reasonable cause relief is generally granted *when the taxpayer exercises ordinary business care and prudence in determining their tax obligations* but nevertheless is unable to comply with those obligations.

*Congdon v. United States*, No. 4:09-CV-289, 2011 WL 3880524, at *2–3 (E.D. Tex. Aug. 11, 2011), *report and recommendation adopted*, No. 4:09-CV-289, 2011 WL 3880564 (E.D. Tex. Aug. 31, 2011) (citing I.R.M. 20.1.1.3.1(1)) (emphasis added).[10]  "The elements that must be present to constitute reasonable cause are a question of law, but whether those elements are present in a given situation is a question of fact."  *Id.* (citing *N.Y. Guangdong Fin., Inc., v. Comm'r*, 588 F.3d 889, 896 (5th Cir. 2009).  Thus, "to demonstrate reasonable cause, [Mr. Bittner] must show that he exercised ordinary business care and prudence."  *Id.*; *United States v. Boyle,* 469 U.S. 241, 249 n.8 (1985).

In his pleadings and motions, Mr. Bittner's main argument for why he qualifies under the reasonable cause exception essentially boils down to: "I didn't know I had to file an FBAR." Taken alone, however, this argument fails on its face.  As a general rule, ignorance of the law is no excuse.  *United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558, 562 (1971).  Thus, Mr. Bittner does not qualify automatically for the reasonable cause safe harbor merely by claiming that

---

[10] "I.R.M." refers to the Internal Revenue Manual.

he "had never heard of FBAR forms, much less that as a naturalized U.S. citizen living abroad he was required to file them" (Dkt. #28).

Mr. Bittner presses on, however, arguing in his sur-reply that other factors made his non-willful FBAR violations reasonable. He claims that because he was educated outside of the United States; had no instruction or education in accounting, tax law, or finances; had no close contact with the United States during the relevant period; and took prompt steps to correct his mistake after learning of his compliance failure, there is a genuine issue of material fact as to the applicability of the reasonable cause exception (Dkt. #61). For support, he points to this Court's decision in *Congdon*. There, the Court stated the following:

> Ignorance of the law, in and of itself, does not constitute reasonable cause. However, reasonable cause may be established if the taxpayer shows ignorance of the law in conjunction with other facts and circumstances. Some factors to be considered include the following: the taxpayer's education, if the taxpayer has been previously subject to the tax, if the taxpayer has been penalized before, if there were recent changes in the tax forms or law which a taxpayer could not reasonably be expected to know, and the level of complexity of a tax or compliance issue. Generally, the most important factor in determining whether the taxpayer has reasonable cause and acted in good faith is the extent of the taxpayer's effort to report the proper tax liability.

*Congdon*, 2011 WL 3880524, at *3 (internal citations omitted).

Mr. Bittner's reliance on *Congdon* is misplaced; the factual circumstances in *Congdon* are distinguishable from those here. In *Congdon*, the Court concluded that there was a "genuine dispute regarding whether Plaintiff acted with ordinary business care and prudence" based on the plaintiff having argued that he "spent a reasonable time and effort preparing Form 5471, [] included all income and expenses of the foreign corporation on his tax return (Form 1040), [] paid the correct and appropriate tax, and [] spent over 200 hours each year collecting information." *Id.* In other words, there was a genuine dispute as to whether the plaintiff had acted in good faith by making an effort to report his proper tax liability. Here, there is no dispute as to whether Mr. Bittner made

27

a similar effort—he *admitted* that he "did not take affirmative steps to learn about" his FBAR reporting obligations (Dkt. #61). The *Congdon* plaintiff spent 200 hours attempting to comply with his legal obligations; Mr. Bittner spent zero hours attempting to do so much as learn about his. The two individuals are not comparable.

Mr. Bittner then argues that his FBAR violations are excused under the reasonable cause exception because, after returning to the United States, he sought the advice of a CPA—Mr. Beckley—through whom he learned about his FBAR obligations and attempted to remedy his past violations. But that was not until 2012—sixteen (16) years after he was first required to file an FBAR. It would be one thing if Mr. Bittner sought the advice of a CPA at the outset and reasonably relied on the CPA's advice, even if that advice later turned out to be misguided. But that is not what happened. Mr. Bittner "has not shown that [he] took any steps to learn whether [he] was required to report [his] foreign financial accounts." *See Ott*, 2019 WL 371449, at *2. And he cannot now, sixteen (16) years later, argue that his failure to do so was somehow reasonable.

And in any event, "reliance on . . . the advice of a professional tax advisor or an appraiser does not necessarily demonstrate reasonable cause and good faith"; other outstanding circumstances are required to make a showing of reasonable reliance and good faith. *Id.* (quoting *Jarnagin*, 134 Fed. Cl. at 376). As discussed *supra*, Mr. Bittner did not make such a showing.[11]

To be sure, the Court in *Congdon* also considered it significant that the plaintiff "had little to no instruction in the area of accounting, tax law, or finances." *Congdon*, 2011 WL 3880524, at *3. And apparently neither did Mr. Bittner. But Mr. Bittner was undoubtedly a sophisticated business professional, as demonstrated by his business and investment savvy. Moreover, Mr.

---

[11] The IRS gives some examples of what might be considered reasonable cause, such as reliance on erroneous advice by the IRS, the taxpayer is unable to obtain records, or death, serious illness, or unavoidable absence. I.R.M. 20.1.1.3.1.2.4; I.R.M. 20.1.1.3.1.2.5; I.R.M. 20.1.1.3.2.4. None of those apply in this case.

Bittner was aware of at least some of his United States income tax obligations.  Mr. Bittner cannot claim with a straight face that, as an American citizen generating millions of dollars in income abroad, he was so unaware that he might have United States reporting obligations that he did not even feel compelled to investigate the matter.  *See Jarnagin*, 134 Fed. Cl. at 378 ("A reasonable person, particularly one with the sophistication, investments, and wealth of the [plaintiffs], would not have signed their income tax returns without reading them, would have identified the clear error committed by their accountants, *and would have sought advice regarding their obligation to file [an FBAR].*") (emphasis added).  Accordingly, there is no genuine issue of material fact as to whether Mr. Bittner acted with ordinary business care and prudence so as to trigger the reasonable cause exception under § 5321(a)(5)(B)(ii).

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendant Alexandru Bittner's Motion for Partial Summary Judgment (Dkt. #28) is **GRANTED**.

It is further **ORDERED** that United States' Motion for Partial Summary Judgment (Dkt. #29) is **GRANTED in part** and **DENIED in part**.  It is **GRANTED** only as to the Government's argument that Mr. Bittner's non-willful FBAR violations were not due to reasonable cause.  All other relief sought by the Government in its motion for partial summary judgment is **DENIED**.

**SIGNED this 29th day of June, 2020.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE